UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK: SYRACUSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* [SEALED], Plaintiff, – Against – [SEALED], Defendants. | Civil Action No $\underline{5:20\text{-cv-}630\text{ (MAD/TWD)}}$ FALSE CLAIMS ACT COMPLAINT **[FILED UNDER SEAL]** |

**FILED IN CAMERA AND UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2)
DO NOT POST ON ECF
DO NOT PUT IN PRESS BOX**

Thomas & Solomon LLP
693 East Avenue
Rochester, NY
Tel:    (585) 272-0540
Fax:    (585) 272-0574

Law Offices of Darth M. Newman LLC
1140 Thorn Run Rd, #601
Coraopolis, PA 15108
(412) 436-3443

*Counsel for Plaintiff Relator*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK: SYRACUSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE of NEW YORK *ex rel.* Dr. HELENE BERNSTEIN, MD, PhD,<br><br>*Plaintiff,*<br><br>          v.<br><br>Dr. ROBERT SILVERMAN, UNIVERSITY OB/GYN ASSOCIATES, INC., CROUSE HEALTH HOSPITAL, INC., & CROUSE HEALTH SYSTEM, INC.,<br><br>          Defendants. | Civil Action No 5:20-cv-630 (MAD/TWD)<br><br>FALSE CLAIMS ACT COMPLAINT<br><br>**[FILED UNDER SEAL]** |

*Qui tam* plaintiff and Relator Dr. Helene Bernstein, MD, PhD, through her undersigned attorneys, hereby brings this action on behalf of the United States of America and the State of New York, and on her own behalf as to the retaliation claims, against:

- Dr. Robert Silverman;

- University OB/GYN Associates, Inc. ("OB/GYN Associates"), and

- Crouse Health Hospital, Inc., and Crouse Health System, Inc. (the "Crouse Defendants" and together with OB/GYN Associates the "Entity Defendants").

The claims asserted in this Complaint are based on Defendants submitting, or causing to be submitted, materially false bills for medical services which were not performed and on Defendants retaliation against Relator for reporting, attempting to stop, and refusing

to participate in Defendants' dangerous and fraudulent patient care. In particular, Dr.

Silverman often does not perform the physician reading, interpretation, evaluation, and

management portion of the maternal ultrasound and fetal nonstress tests ordered for

unsuspecting expectant mothers at Upstate University Hospital and Crouse Hospital.

Nevertheless, Dr. Silverman attests to performing this work and he and the other

Defendants bill, or cause to be billed, the United States and the State of New York as if

the work had been completed. In addition, Defendants retaliated against Relator after

she reported and attempted to stop the fraudulent and dangerous patient care set out

herein. The claims are based on the facts and information set forth below unless

otherwise stated.

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ 3

NATURE OF THE CLAIM .......................................................................................... 4

PARTIES ...................................................................................................................... 5

    A.  Relator – Dr. Bernstein ................................................................................ 5

    B.  Defendant Dr. Silverman ............................................................................ 7

    C.  Defendant University OB/GYN Associates .............................................. 8

    D.  Defendant Crouse Health Hospital ........................................................... 9

    E.  Defendant Crouse Health System .............................................................. 9

JURISDICTION AND VENUE ................................................................................. 10

FACTS ......................................................................................................................... 11

    I.  Governing Law ............................................................................................. 11

    A.  The Federal False Claims Act ..................................................................... 11

    B.  The New York False Claims Act ................................................................. 13

    C.  New York Labor Law §§ 740 and 741 ..................................................... 15

    D.  The Government Healthcare Programs ..................................................... 16

    II.  Defendants made fraudulent claims for obstetric testing that was not completed ....................................................................................................... 20

    A.  Advanced ultrasonography ........................................................................ 21

    B.  Fetal nonstress tests .................................................................................... 26

    III.  Relator discovers the fraud ....................................................................... 29

    IV.  Relator internally reports fraud and dangerous patient care ................ 30

    V.  Defendants attempt a coverup .................................................................. 33

    A.  Defendants' campaign of harassment ...................................................... 34

    B.  Changes to Relator's compensation and titles ........................................ 36

    C.  Sham peer review activity .......................................................................... 37

    D.  Other attempts to hide the facts ............................................................... 39

CAUSES OF ACTION ................................................................................................ 42

## NATURE OF THE CLAIM

1.      Relator sued Defendants to recover treble damages and civil penalties on behalf of the United States of America and the State of New York for Defendants' many false claims for payment which were submitted to Medicare, Medicaid, Tricare and other federally or state-funded government healthcare programs ("Government Healthcare Programs").

2.      Relator also sues Defendants for their retaliation against her after she internally reported Defendants' frauds and dangerous patient care and refused to participate in the fraud and dangerous patient care described herein.

3.      Defendants knew they did not meet the established criteria set by the various Government Healthcare Programs.

4.      Defendants engaged in the below described fraud against the United States and New York in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), and the New York False Claims Act, State Finance Law § 187 *et seq.* ("NYFCA").

5.      Defendants also retaliated against Relator for her efforts to report, stop, and refuse to participate in Defendants' dangerous patient care and fraudulent billing. Defendants' retaliation violates the FCA, 31 U.S.C. § 3730(h), the NYFCA, State Fin. Law § 191, and New York whistleblower law, Labor Law §§ 740 & 741.

6.      As a member of Defendant OB/GYN Associates, a tenured employee of Upstate Medical University, and member of the clinical staff at both Crouse Hospital and Upstate University Hospital, Relator personally observed Dr. Silverman attest to

performing patient care services he did not perform and then Defendants submit, or cause to be submitted, materially false claims for payment to Government Healthcare Programs for those unperformed services.

7.      The Maternal Fetal Medicine practice at Upstate Medical University and Crouse Hospital performs ultrasonography and fetal nonstress tests as part of the care provided to expectant mothers with high-risk pregnancies.

8.      These studies, and physician reading and evaluation of the studies, are crucial for the proper diagnosis and management of expectant mothers and their babies.

9.      Unfortunately, the longtime practice leader, Dr. Robert Silverman, regularly does not bother to view the study results and therefore does not perform the physician evaluation and management services for which he, and the other Defendants, nevertheless bill Government Healthcare Programs.

10.     Approximately 70% of the ultrasound and fetal nonstress tests performed at Upstate and Crouse are billed to Government Healthcare Programs.

11.     Because these studies are not being properly completed or used, patients and their babies are being seriously hurt.

**PARTIES**

**A.      Relator – Dr. Bernstein**

12.     Relator Dr. Helene Bernstein, MD, PhD is dual board certified in Obstetrics and Gynecology and Maternal Fetal Medicine.

5

13.     She joined the Upstate University Medical School faculty in October 2015 as the Division Director of Maternal Fetal Medicine and continues to be an Associate Professor of Obstetrics and Gynecology and an Associate Professor of Microbiology and Immunology.

14.     Dr. Bernstein has tenure at Upstate University Medical School.

15.     She also holds clinical privileges at both Upstate University Hospital and Crouse Hospital.

16.     Before coming to work at Upstate, Dr. Bernstein was the Director of the Cord Blood Center at University Hospitals, Case Comprehensive Cancer Center in Cleveland, Ohio, the Obstetric Director of the Mother/Child Immunology Clinic at Ronald Reagan UCLA Medical Center in Los Angeles, California, and the Director of the High Risk Obstetrics Clinic at UCLA Medical Center.

17.     Before she filled these leadership positions, Dr. Bernstein received her medical degree from and completed her PhD in Microbiology at the University of Alabama.

18.     After receiving her degrees, Dr. Bernstein completed her intern year at Washington University and her residency at Albany Medical College.

19.     From there she completed a research fellowship at the National Institute of Allergy and Infectious Disease under the mentorship of Dr. Anthony Fauci, while pursuing a clinical maternal fetal medicine fellowship at Johns Hopkins.

20.     Dr. Bernstein's many publications, professional associations, awards, and positions are too numerous to list.

21.     It is, however, important to note that she serves as a member of the Coding Committee for the Society for Maternal-Fetal Medicine.

22.     This means Dr. Bernstein is among a handful of people nationwide who decide what is and is not proper coding/billing behavior within her specialty – the exact fraud at issue here.

**B.     Defendant Dr. Silverman**

23.     Defendant Robert Silverman, MD is the former Division Director of Maternal Fetal Medicine at Upstate University Hospital.

24.     He was promoted to Chair of Obstetrics and Gynecology at Upstate University Hospital before Dr. Bernstein was hired on as Division Director.

25.     Upon Dr. Silverman's promotion, the Division Director position was left vacant until it was filled several years later by Dr. Bernstein.

26.     Dr. Silverman is also board certified in Maternal Fetal Medicine and is a Professor at Upstate University Medical School.

27.     In addition to his clinical and academic appointments, Dr. Silverman is the longtime president of OB/GYN Associates, the physician services entity, known as a medical services group ("MSG"), that bills for provider services performed by Upstate Medical University affiliated Obstetrics and Gynecologic providers at Upstate and Crouse and then compensates physicians with the majority of their salary.

7

28.     For years, Dr. Silverman has been shirking his clinical duties and his obligations to patients by failing to read, interpret, and evaluate the results of ultrasound and fetal nonstress tests ordered for patients.

29.     He nevertheless attests to performing these service and bills for them.

30.     Government Healthcare Programs are among the payers being defrauded by Dr. Silverman in this way.

31.     He has also used his leadership positions at both Upstate and OB/GYN Associates to punish and retaliate against those raising concerns or try to stop his fraudulent and dangerous practices.

**C.      Defendant University OB/GYN Associates**

32.     Defendant OB/GYN Associates is a not for profit corporation incorporated under the laws of the State of New York with a principal place of business at 736 Irving Avenue, 3rd Floor, West Tower, Syracuse, New York, 13210.

33.     OB/GYN Associates is a physician services entity which bills and collects revenue for physician services performed by Upstate Medical University affiliated Obstetric and Gynecologic providers at Upstate and Crouse hospitals.

34.     Until May 31, 2020, Dr. Silverman was the President of OB/GYN Associates.

35.     Since starting at Upstate and Crouse, Dr. Bernstein has been, and continues to be, a member of OB/GYN Associates.

36.     On behalf of Dr. Silverman, OB/GYN Associates submits, or causes to be submitted, to Government Healthcare Programs materially false bills for the study reading, evaluation, and management services Dr. Silverman does not perform.

37.     In addition, OB/GYN Associates joined with Dr. Silverman to retaliate against Dr. Bernstein by restricting and withholding her compensation.

**D.     Defendant Crouse Health Hospital**

38.     Defendant Crouse Health Hospital is a not for profit corporation incorporated under the laws of the State of New York with a principal place of business at 736 Irving Avenue, Syracuse, New York, 13210.

39.     Upon information and belief, Crouse Health Hospital owns and/or controls Crouse Hospital or it owns and/or controls another Crouse entity that owns and/or controls Crouse Hospital and is ultimately responsible for submitting, or causing to be submitted, bills for the technical (facility fee) component of the fetal nonstress tests Dr. Silverman falsely attests to completing.

**E.     Defendant Crouse Health System**

40.     Defendant Crouse Health System is a not for profit corporation incorporated under the laws of the State of New York with a principal place of business at 736 Irving Avenue, Syracuse, New York, 13210.

41.     Upon information and belief, Crouse Health System owns and/or controls Crouse Hospital or it owns and/or controls another Crouse entity that owns and/or controls Crouse Hospital and is ultimately responsible for submitting, or causing to be

submitted, bills for the technical (facility fee) component of the fetal nonstress tests Dr.

Silverman falsely attests to completing.

## **JURISDICTION AND VENUE**

42.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345

because this action involves a federal question and the United Sates is  plaintiff. This

Court also has subject matter jurisdiction under 31 U.S.C. § 3732(a).

43.     The Court has supplemental subject matter jurisdiction over the state law

claims under 28 U.S.C. § 1367 because they are so related to the False Claims Act that

they form part of the same controversy and under 31 U.S.C. § 3732(b) because the state

law causes of action arise from the same transactions or occurrences as the claims

brought under 31 U.S.C. § 3730.

44.     The Court may exercise personal jurisdiction over the Defendants under 31

U.S.C. § 3732(a). The Court has personal jurisdiction over Defendants because they

regularly transact business within this District.

45.     Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §

1391(b) & (c) because Defendants transact business or are found within this District and

a substantial part of the events establishing the alleged claims arose in this District.

46.     No allegation in this Complaint is based on a public disclosure of

allegations or transactions in a Federal criminal, civil, or administrative hearing in which

the Government or its agent is a party; in a congressional, administrative, or General

Accountability Office, or other Federal, New York State or New York local government

report, hearing, audit, or investigation; or from the news media. Rather, Relator is the original source.

47.     Under 31 USC § 3730(b)(2), this Complaint was filed in camera and under seal and shall not be served on the Defendants until the Court so orders.

48.     Under 31 U.S.C. § 3730(b)(2), Relator shall provide the Government with a copy of the Complaint and Relator's written disclosure statement, together with exhibits, of substantially all material evidence and material information in her possession referenced in and/or related to the Complaint.

49.     Under the NYFCA § 190(2)(b), Relator shall provide the Government with a copy of the Complaint and Relator's written disclosure statement, together with exhibits, of substantially all material evidence and material information in her possession referenced in and/or related to the Complaint

## FACTS

**I.     Governing Law**

**A.     The Federal False Claims Act**

50.     The FCA imposes liability upon any person who "knowingly presents, or cause to be presented [to the Government] a false or fraudulent claim for payment or approval," "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," or conspires to do so.  31 U.S.C. § 3729(a)(1).

51.     Any person found to have violated these provisions is liable for a civil penalty of not less than $11,665 and not more than $23,331 for each such violation, plus three times the damage sustained by the Government.

52.     The FCA imposes liability where conducts is "in reckless disregard of the truth or falsity of the information" and clarifies that "no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b).

53.     The FCA also broadly defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has tittle to the money or property, that - ... is made to a contractor, grantee, or other recipient if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest ... " 31 U.S.C. § 3729(b)(2)(A).

54.     The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to sue on behalf of the Government and to share in any recovery. The complaint must be filed under seal without service on any defendant. The complaint remains under seal while the Government conducts an investigation of the allegations and determines whether to intervene. 31 U.S.C. §3730(b).

55.     The FCA also protects employees from retaliation which includes being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts

done by the employee ... in furtherance of an action under [the FCA] other efforts to stop 1 or more violations of" the FCA. 31 U.S.C. §3730(h).

56.     Relief for retaliation includes "2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees."  31 U.S.C. §3730(h).

### B.     The New York False Claims Act

57.     The New York False Claims Act ("NYFCA"), which appears at New York State Finance Law § 187-194 is largely similar to the FCA.

58.     Like the FCA, the NYFCA prohibits the submission of false claims and permits private persons to bring an enforcement action on behalf of the State.

59.     Each of the false claims and other FCA violations alleged herein which were presented to Medicaid are also violations of the NYFCA.

60.     For example, the NYFCA imposes liability on any person who

(a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

...

(g) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government

or conspires to do so. State Fin. Law § 189(1)(a-c, g).

61.     Any person found to have violated these provisions is liable for a civil penalty of not less than $11,665 and not more than $23,331 for each such violation, plus three times the damage sustained by the State Government. State Fin. Law § 189(1)(h).

62.     Like the FCA, the NYFCA broadly defines "claims", imposes liability where conduct is "in reckless disregard of the truth or falsity of the information", and does not require any "proof of specific intent to defraud..." State Fin. Law § 188(1-2).

63.     Like the FCA, the NYFCA permits private persons to sue on behalf of the State Government and to share in any recovery. State Fin. Law § 190(2).

64.     Finally, the NYFCA protects employees from retaliation which includes being "discharged, demoted, suspended, threatened, harassed or in any other manner discriminated against in the terms and conditions of employment, or otherwise harmed or penalized by an employer, ... because of lawful acts done by the employee ... in furtherance of an action brought under [the NYFCA] or other efforts to stop one or more violations of" the NYFCA.  State Fin. Law § 191(1).

65.     The NYFCA provides that persons subjected to retaliation may recover injunctive relief, "payment of two times back pay, plus interest, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." State Fin. Law § 191(1).

C.    **New York Labor Law §§ 740 and 741**

66.    New York Labor Law §§ 740 and 741 protect employees, and in particular health care employees, from retaliation for complaints about, actions to stop, or refusal to participate in, "improper patient care".

67.    Labor Law § 741(d) defines "improper patient care" to mean:

with respect to patient care, any practice, procedure, action or failure to act of an employer which violates any law, rule, regulation or declaratory ruling adopted pursuant to law, where such violation relates to matters which may present a substantial and specific danger to public health or safety or a significant threat to the health of a specific patient.

68.    "Retaliatory Action" means: "the discharge, suspension, demotion, penalization or discrimination against an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." Labor Law § 741(1)(f).

69.    Labor Law § 741(2) provides that:

no employer shall take retaliatory action against any employee because the employee does any of the following:

(a)  discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care;  or

(b)  objects to, or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care.

70.    Health care employees may enforce Labor Law § 741 under Labor Law §§ 740(4)(d) and 740(5) which permits suit and provides for recovery including

15

injunctive relief, "compensation for lost wages, benefits and other remuneration;  and

the payment by the employer of reasonable costs, disbursements, and attorney's fees."

71.     In addition, the Court may impose an additional civil penalty of up to

$10,000 "to be paid to the improving quality of patient care fund" upon a finding the

employer acted in bad faith. Labor Law § 740(4)(d).

72.     Finally, Labor Law § 740(2) adds health care fraud to the list of bad acts

employees are permitted to disclose, object to, and refuse to participate in without fear

of retaliation.

### D.    **The Government Healthcare Programs**

73.     Medicare was created in 1965 by Title XVIII of the Social Security Act and is

by far the largest health plan in the United States. Medicare Part A (the basic plan of

hospital insurance) covers the cost of hospital inpatient stays and post-hospital skilled

nursing facility care. 42 U.S.C. § l 395j to 1395w-4. Medicare Part B is a federally

subsidized, voluntary insurance program that covers a percentage (typically 80%) of the

fee schedule amount of physician and laboratory services. 42 U.S.C. §§ 1395k, 13951,

1395x(s).

74.     Medicare is generally administered by the Centers for Medicare and

Medicaid Services ("CMS"), which is an agency of the Department of Health and Human

Services. CMS establishes rules for, and contracts with private companies to handle, the

day-to-day administration of Medicare.

75.     Medicare only pays for services or equipment that are reasonable and medically necessary. 42 U.S.C. § I 395y(a)(1)(A). Further, all providers enrolled in the Medicare program must provide economical medical services. 42 U.S.C. § 1320c-5(a)(1). Providers must assure that the services they provide are medically necessary and appropriate. *See* 42 U.S.C. § I 320c-5(a)(3). The funds used to pay Medicare Part A claims come both from federal payroll and general tax revenues. The funds to pay for Part B come from premiums paid by Social Security recipients and general U.S. tax revenues.

76.     Medicaid, a health insurance program created by Title XIX of the Social Security Act of 1965, authorizes grants to States for medical assistance to children, blind, aged and disabled individuals whose income and resources are not sufficient to meet the costs of necessary medical care.  42 U.S.C. § 1396; 42 C.F.R. § 430.0; *see also* 42 U.S.C. §§ 1396-1396v.  Thus, Medicaid primarily benefits people and families with low incomes and disabled individuals.  Medicaid is a means-tested program that is jointly funded by the States and the Federal Government and is managed by the States. The amount of Federal funding in a State's program is determined by a statutory formula set forth in 42 U.S.C. §§ 1396b(a) and 1396d(b).

77.     Upon information and belief, Medicaid provides health care coverage for approximately 53 million people. Each State administers its own Medicaid program while CMS monitors the State-run programs and establishes requirements for service delivery, quality, funding and eligibility standards. States provide up to half of the funding for the Medicaid program.

78.     A State that elects to participate in Medicaid must establish a plan for providing medical assistance to qualified beneficiaries. 42 U .S.C. § 1396a(a)-(b); *see also* 42 C.F.R. Part 430, Subparts A and B; CMS State Medicaid Manual § 13025. In exchange, the Federal Government, through CMS, pays to each participating State the Federal portion of the expenditures made by the participating State to providers and ensures that the States comply with minimum standards in the administration of Medicaid. 42 U.S.C. §§ 1396, 1396a, and 1396b.

79.     The State of New York has elected to participate in Medicaid, has established a State plan under Medicaid and has promulgated regulations that implement the State plan. N.Y. Soc. Serv. L. §§ 363 *et. seq.*; 10 N.Y.C.R.R. Parts 85-86; 18 N.Y.C.R.R. Part 360. The New York State Department of Health (hereinafter "NYSDOH") is the sole Medicaid agency that has contracted with HHS to administer or supervise Medicaid in New York State.  N.Y. Pub. Health L. § 201.1(v); *see also* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10(b).

80.     Federal Medicaid law does not set precise requirements and States are free to set payment rates. Individuals or entities that provide services to Medicaid beneficiaries in New York submit claims for payment to NYSDOH or its local delegate agency. 42 C.F.R. § 430.0.  Payments are made based on types and ranges of services, payment levels for services and administrative and operating procedures established by the State in accordance with Federal laws, statutes and rules. *Id.*

81.     In New York, a provider that treats Medicaid beneficiaries may only submit claims for reimbursement for services that have been provided in compliance with Title 18 of the New York Code of Rules and Regulations.  18 N.Y.C.R.R. § 504.6(d).  By enrolling in the New York State Medicaid program, a provider agrees to comply with the rules, regulations and official directives of NYSDOH.  18 N.Y.C.R.R. § 504.3(i).

82.     18 N.Y.C.R.R. § 515.2 provides, in pertinent part:

(a) Unacceptable practices under the medical assistance program. (1) . . . conduct by a person which is contrary to the official rules and regulations of [NYSDOH]; (2) . . . conduct by a person which is contrary to the published fees, rates, claiming instructions or procedures of [NYSDOH]; (4) . . . conduct by a person which is contrary to the regulations of [HHS] promulgated under [Title XIX]; (b) Conduct included. An unacceptable practice is conduct which constitutes fraud or abuse and includes the practices specifically enumerated in this subdivision. (1) False claims: (i) Submitting, or causing to be submitted, a claim or claims for unfurnished medical care, services or supplies; (2) False statements: (i) making or causing to be made any false, fictitious or fraudulent statement or misrepresentation of material fact in claiming a medical assistance payment. or for use in determining the right to payment; (3) Failure to disclose: Having knowledge of any event affecting the right to payment of any person and concealing or failing to disclose the event with the intention that a payment be made when not authorized, or in a greater amount than due.

83.     At all times relevant hereto, Defendants were required to and did submit an enrollment application to participate in the New York State Medicaid Program.

84.     At all times relevant hereto, Defendants were required to and did submit along with such applications a certification that they would comply with all NYSDOH and Medicaid regulations, as well as impliedly certifying compliance with such regulations by submitting claims for reimbursements.

19

85.     Additionally, Federal regulations require compliance with state rules and regulations as a condition of payment of the Federal share of Medicaid. *See* 2 C.F.R. § 225 App. A(C)(1)(c).

86.     Approximately 70% of bills generated by the Upstate and Crouse Maternal Fetal Medicine practice are directed to one of several Government Healthcare Programs.

## II.     Defendants made fraudulent claims for obstetric testing that was not completed

87.     Defendants false claims relate to two different types of maternal fetal testing: ultrasonography and fetal nonstress tests.

88.     Both types of tests, described in greater detail below, are performed bedside by non-physician staff.

89.     The resulting fetal images and fetal heart rate tracings are then provided to the attending physician to be read, interpreted, evaluated, and correlated with each patient's clinical course.

90.     The studies are only medically reasonable, necessary, or useful after the resulting images and tracings have been read, interpreted, evaluated, and correlated by a physician.

91.     Physicians can then use the results of the studies to diagnose and manage all manner of maternal and fetal complications.

92.     Indeed, when properly completed, these studies can help save the life of baby and mother, indicate the need for immediate and urgent surgery or delivery,

trigger hospice planning, prevent unwarranted and futile surgery, and inform expectant mothers about their medical and reproductive risks.

93.     As described below, misuse of the studies can result in missed diagnoses, incorrect diagnoses, and inappropriate management leading to wrongful births, unnecessary surgical interventions, fetal demise, maternal injury, and substantial psychological harm.

**A.      Advanced ultrasonography**

94.     Ultrasonography is used in obstetrics care to confirm fetal number and viability, placentation, gestational age and screen for fetal abnormalities.

95.     Advanced ultrasonography is the more complicated and detailed version of this service performed virtually exclusively by maternal fetal medicine and radiologist physicians.

96.     Advanced ultrasonography offers a higher level of diagnostic, prognostic, and management accuracy and cannot be performed by general obstetrician gynecologists without advanced training.

97.     Maternal fetal medicine subspecialty training is heavily ultrasound based, and only offered to trained obstetrician gynecologists. The combination of advanced imaging, knowledge, and experience is critical to the diagnosis and management of various complex syndromes involving multiple organ systems including Cornelia de Lange, Beckwith-Wiedemann, DiGeorge, Meckel-Gruber, Smith-Lemli-Opitz, and VACTERL.

98.     On average, more than 50% of a maternal fetal medicine physician's income will be derived from ultrasound procedures.

99.     OB/GYN Associate's maternal fetal medicine practice follows this average and more than 50% of their physician income is derived from ultrasound procedures.

100.     The more procedures a physician bills for, the more money that physician, and the facility that bills for the associated facility fee, will make. Dr. Silverman continually touts his record as the lead income generator within the Obstetrics and Gynecology department.

101.     Like most evaluation and management services, ultrasound generates charges for physician services (wRVU) and a technical or facility fee (tRVU) – the facility fee is significantly larger than the physician services fee.

102.     Ultrasound imaging is performed on an outpatient basis at Upstate University Hospital.

103.     A technician operates the ultrasound machine and captures images and video clips of an expectant mother's womb and baby.

104.     The technician also creates a narrative report draft including measurements and a description of their findings.

105.     The images are then uploaded to a system called PACS (picture archiving and communications system) for later evaluation by an attending physician.

106.    Once the images are uploaded and available on PACS, the attending physician has to login to evaluate and review the images and finalize the draft report, in a separate EMR system called Clickview.

107.    This evaluation/review process takes between five and 20 minutes for an experienced physician to accomplish.

108.    Some studies generate more images and some cases are more difficult than others.

109.    Physician evaluation, diagnosis, and correlation to clinical course (and/or management recommendations) are crucial for all patients.

110.    Following review and evaluation of images, the attending physician must complete and validate the study report which involves electronically attesting to having personally reviewed the images.

111.    The attestation used at Upstate reads:

> I have reviewed the ultrasound images. Due to the limitations of prenatal diagnostic ultrasound, there may be anomalies present that are not detected on the current exam.

112.    PACS systems generally, and the Upstate PACS system in particular, capture the date, time, and user identity for every person accessing PACS images, including how much time was spent viewing images within a particular study packet.

113.    After reviewing study images, the attending physician should discuss the results with the patient and adjust future patient management in accordance with their findings and the patient's wishes.

23

114.    Dr. Silverman routinely does not view study images but applies the attestation as if he had.

115.    He and OB/GYN Associates go on to bill Government Healthcare Programs for these studies despite never completing the work.

116.    Not only does this generate a literal false claim but it leads to serious and preventable patient harm.

117.    Physician review and evaluation of study images is required to accurately diagnose and manage a host of fetal abnormalities.

118.    Dr. Silverman's failure to review images has resulted in various serious diagnoses being missed.

119.    For example, one of Dr. Silverman's patients had multiple abnormalities which, based on the ultrasound findings, could be readily diagnosed by someone without maternal fetal medicine training as Cornelia de Lange syndrome.

120.    Because Dr. Silverman did not properly review the ultrasound study, he did not translate the multiple delineated findings into this important diagnosis and the mother was never given an accurate diagnosis.

121.    Instead, the mother was incorrectly told by Dr. Silverman her baby was going to die and that she would require a C-section to remove the fetus.

122.    He also told the patient he intended to be present for the delivery, an additional falsehood the nursing staff had to correct.

123.     This patient was presented at a perinatal pediatrics conference where an attendee suggested the diagnosis of Cornelia De Lange syndrome. Despite this "curbside consult" from a colleague, Dr. Silverman never used this information (which should have been part of his own evaluation) for the patient's benefit.

124.     Perinatal hospice became involved in her case.

125.     The mother made funeral arrangements and even bought a casket.

126.     Instead, the mother had a live surgical birth despite the surgery being completely unnecessary and now has a child with special needs – neither of which she expected.

127.     Unfortunately, the patient described above is not the only woman who was erroneously told by Dr. Silverman her fetus would not survive.

128.     Still other patients have been incorrectly told their pregnancies were normal when they clearly were not.

129.     As a result, women have continued obviously non-viable pregnancies and suffered dangerous complications that could have been avoided.

130.     Even at baseline (without complications), pregnancy increases a woman's risk of morbidity and mortality

131.     Continuing a non-viable pregnancy exposes a woman to avoidable and unnecessary risk of injury and death.

132.    Some conditions diagnosable with advanced ultrasonography have the potential to impact future pregnancies of the woman as well as genetically related family members.

133.    For example, a mother that has one baby with a cardiac or central nervous system defect, has a significantly higher chance that a future pregnancy will have a similar defect, compared to women without a prior fetal anomaly. Moreover, genetic abnormalities that are diagnosable via ultrasound can also impact family members.

**B.**    **Fetal nonstress tests**

134.    A fetal nonstress test consists of 20 minutes of uninterrupted fetal heart rate monitoring conducted without external stressors. The resulting heart rate tracing is not all that dissimilar from the output of an EKG.

135.    Like ultrasounds, after a fetal nonstress test is performed by a technician or nurse the tracing must be interpreted by a physician.

136.    Fetal nonstress test results can indicate the need for additional testing or immediate delivery.

137.    When doctors do not read/interpret the results, patients who require additional testing or interventions, which may even include immediate delivery, may not receive them.

138.    All outpatient services are performed at Upstate and all inpatient services, including labor and delivery, are provided at Crouse.

26

139.   Fetal nonstress tests are administered in both the out- and inpatient settings.

140.   When nonstress tests are done in the Upstate outpatient clinic, the fetal heart rate tracings are printed out on accordion folded paper, banded, and left for the physician covering the clinic to read and interpret.

141.   Physicians pick up, unfurl, and read the tracings.

142.   After doing so, they sign a sticker on the side of the paper tracing to indicate and confirm that they did in fact receive, read, and evaluate the tracing.

143.   Dr. Silverman routinely picks up the paper packets but does not unfurl these outpatient fetal heart rate tracings.

144.   Instead, he signs the stickers falsely indicating he has read and evaluated the fetal heart rate tracing and puts the packets back.

145.   Nonstress tests performed on inpatients at Crouse are not printed, but captured electronically by the GE Centricity System. In order to interpret these studies, the physician has to log in to Centricity view the fetal heart rate tracings. Documentation/attestation is completed in the Soarian EMR (a separate system).

146.   Like all modern EMR systems, the GE Centricity System logs the date, time, and identity of all user interactions, including which studies they have viewed.

147.   Dr. Silverman routinely does not login and view these tracings.

148.    Nevertheless, Defendants bill Government Healthcare Providers for these tests and for Dr. Silverman's "service" of reading and interpreting the tests – work that is not being completed.

149.    Like the uncompleted ultrasounds, nonstress tests that are validated without being properly interpreted can lead to serious patient harm.

150.    For the most part, nonstress test are ordered for fetuses at increased risk of distress.

151.    Nonstress test results are used to determine whether a patient should receive additional testing, can be continued to be managed expectantly (as an inpatient or outpatient), or requires intervention with rare cases considered for immediate delivery.

152.    By not reading the tracings, Dr. Silverman is failing to use an important diagnostic tool – yet billing for doing so anyway – exposing women and fetuses to the unnecessary risk of a gap in their medical care.

153.    Like the ultrasounds, Dr. Silverman and the Entity Defendants have a pecuniary interest in performing, and billing, as many nonstress tests as possible. More billed tests equal more facility and physician revenue.

154.    Also like the ultrasounds, nonstress tests generate more revenue per bill for the facilities than they do for the physicians.

### III.    Relator discovers the fraud

155.    Shortly after joining the staff at Upstate and Crouse, in her role as the

Maternal Fetal Medicine division director, the Relator began to hear complaints from

staff and patients that Dr. Silverman would document and bill for spending time with

patients when he did not.

156.    She and others also personally observed Dr. Silverman failing to review the

nonstress testing results described above on more than one occasion.

157.    These concerns and observations were further confirmed through routine

monthly multidisciplinary perinatal conferences that were organized by the Upstate

maternal fetal medicine practice.

158.    These conferences were designed to serve dual duty as perinatal M&M

(morbidity and mortality) conferences and an opportunity for a multidisciplinary team

conference to plan and describe the care women carrying fetuses with known anomalies

would need at the time of delivery.

159.    The Upstate ultrasound coordinator, an award-winning sonographer and

2011 Upstate employee of the year (clinical) was responsible for helping select the

patients that would be discussed at this monthly conference.

160.    The coordinator used personal knowledge, the Clickview system, and the

EMR to choose patients with complex cases for whom definitive care plans had not yet

been established.

161.    Dr. Bernstein and others realized that Dr. Silverman was the physician of record for an outsized number of cases that had been improperly evaluated and managed.

162.    During the presentations, Dr. Silverman's peers questioned whether medically appropriate services were offered to patients and what counseling the patients received.

163.    In response, Dr. Silverman repeatedly made provably false statements about the services he provided, and the care elections made by his patients.

164.    For example, on more than one occasion, Dr. Silverman falsely claimed that patients he cared for had a normal amniocentesis or declined amniocentesis when the medical records showed no evidence of counseling or procedures.

165.    After discovering Dr. Silverman's pattern of deficient care and dishonesty, Relator investigated further confirming the ultrasound and nonstress test frauds described above.

## IV.    Relator internally reports fraud and dangerous patient care

166.    After discovering the dangerous and fraudulent practices set out above, Relator began to continuously report the facts to Upstate and Crouse leadership and encouraged them to take corrective action.

167.    As early as October 2015, Relator had a meeting with the Upstate Medical University Senior Associate Dean of Academics to raise concerns about Dr. Silverman's lack of commitment.

30

168.     In November 2015, she raised clinical care gaps and deficiencies with her immediate supervisor, Dr. Silverman.

169.     These gaps and deficiencies included a specific patient's care and study results going unread and unused.

170.     In April 2016, Relator reported to the Upstate Chief Quality Officer, who happens to be a board certified OB-GYN doctor, that Dr. Silverman was putting patient safety and welfare at risk in part by failing to review test results he had attested to reviewing.

171.     Relator made similar reports to the Upstate Chief Quality Officer and his Crouse counterpart as well as the Upstate Chief Medical Officer, and the Interim Dean throughout 2016, 2017, and 2018.

172.     For example, in August of 2016 Relator advocated to the Crouse Chief Quality Officer that a root cause analysis be undertaken to examine Dr. Silverman's inappropriate care of a specific patient which placed this patient at unnecessary risk.

173.     Relator is not the only concerned staffer. Another person anonymously reported Dr. Silverman's missed Cornelia de Lange diagnosis via Upstate's confidential Safety Intelligence reporting system.

174.     As a result, the case was sent for external review and, in the fall of 2016, the Upstate Chief Quality Officer tasked Dr. Bernstein with identifying and instituting process changes.

31

175.    Dr. Bernstein met with the Upstate Hospital Chief Medical Officer on or about November 15, 2016 to share her concerns that Dr. Silverman had already retaliated against her and would continue to do so if Relator executed her charge to implement changes occasioned by Dr. Silverman's dangerous and fraudulent care.

176.    Dr. Bernstein specifically mentioned a letter she had received in which Dr. Silverman had threatened to reduce her compensation.

177.    She was assured that Dr. Silverman would be completely supportive of the process improvement project.

178.    In reality, however, just two weeks later, Dr. Silverman removed Dr. Bernstein as Maternal Fetal Medicine Division Director and reduced her salary by $15,000 per year.

179.    And, Dr. Silverman continued to attest to completing scans he did not read and continued to harm patients while the Entity Defendants continued to bill for procedures and services that were not completed.

180.    In May 2017, Relator also reported her concerns about Dr. Silverman's dangerous care and false billing activities to the Upstate Vice President of Human Resources.

181.    In early summer 2017, to address the continuing patient safety and billing fraud problems, Relator began advocating for a full external review of the practice.

182.    Independent practice reviews are a service provided by SMFM, the Society for Maternal Fetal Medicine.

183.    The SMFM review was finally approved by Upstate in or about April 2019.

184.    The review was not actually completed until February 2020.

185.    Although Upstate agreed to the SMFM review, they imposed conditions designed to limit the effectiveness of the review.

186.    For example, Upstate forbid SMFM and Relator from interacting and have never made the final report available to anyone outside senior leadership.

187.    However, within one business day of SMFM finishing its site work, Dr. Silverman announced he would retire from Upstate Medical University and relinquish his position as Department Chair.

## V.    Defendants attempt a coverup

188.    Very quickly after Dr. Silverman was first confronted with his deficient care and false statements, he and the Entity Defendants began to take steps to insulate him, and themselves, from scrutiny.

189.    Defendants' coverup has taken many forms. Defendants have:

    a.  executed a campaign of harassment against Relator;

    b.  stripped Relator of various titles and compensation;

    c.  instigated sham peer review investigations; and

    d.  otherwise hidden, or attempted to hide, evidence of wrongdoing.

190.    Defendants continue to perform dangerous patient care and submit fraudulent bills to Government Healthcare Programs.

**A.**     **Defendants' campaign of harassment**

191.     Beginning in or about December 2015, Dr. Silverman led the harassment which included sending letters and emails to Relator castigating her for alleged deficiencies in patient care and work effort.

192.     These messages were routinely false and filled with inaccuracies.

193.     For example, in one instance Dr. Silverman accused Relator of failing to respond to a patient in distress when Relator had never been told there was a patient in distress.

194.     By way of additional example, Dr. Silverman delivered to Relator a "counseling memo" that grossly misstated the medical staff bylaws, American College of Graduate Medical Education (ACGME), and billing requirements and then accused Dr. Bernstein of violating the fake requirements.

195.     The crescendo of this particular harassing communication was the false but serious accusation that Relator had failed to properly supervise medical procedures and was therefore inappropriately billing for procedures – none of these allegations were true.

196.     Dr. Silverman also began demanding Relator work hours in excess of her clinical commitment and generally take on extra tasks.

197.     For example, Dr. Silverman threatened to reduce Relator's compensation if she did not work overnight call which would require her to spend her nights sleeping in the hospital. Combined with other Dr. Silverman-assigned "workday" tasks, the

34

overnight call led to Dr. Bernstein's monthly face to face clinical contact hours to exceed her proscribed maximum clinical commitment (96 hours per month) by over 50 hours per month. These hours were in addition to approximately 60 hours per month of clinical call from home for a total monthly clinical commitment of approximately 200 clinical hours.

198.    By January 2018, this campaign of harassment had become impossible for the Upstate Vice President of Research to ignore. He sent a letter to Dr. Silverman instructing him to stop attempting to overload Relator's schedule and to instead abide by Relator's contract and the offer letter Dr. Silverman himself signed which set out Relator's specific clinical hours requirements.

199.    But Dr. Silverman refused to desist. He began accepting and admitting patients directly to Relator's care without consulting Relator and without examining or even interacting with the patients.

200.    This behavior is unprofessional, exposes Relator to high levels of malpractice risk, and is dangerous for the patients.

201.    He also refused to permit Relator to attend various standard conferences and professional development events.

202.    Dr. Silverman's harassment campaign was undertaken in his mixed personal and official capacities as Relator's clinical colleague, direct supervisor, Clinical Department Chair at Crouse and Upstate, and as President of OB/GYN Associates which controls the majority of Relator's compensation.

35

**B.**     **Changes to Relator's compensation and titles**

203.    Almost immediately after Relator began to raise the alarm about Defendants' unlawful conduct, Dr. Silverman informed her that she would be temporarily stripped of her Division Director title.

204.    In addition, and as mentioned above, shortly after the Chief Medical Officer and Chief Quality Officer assigned Dr. Bernstein the 2016 quality improvement initiative occasioned by Dr. Silverman's dangerous patient care, Dr. Silverman took away the $15,000 per year salary tied to her Division Director title and appointed himself to the Division Director role.

205.    The terms of Relator's employment provided for a fixed annual salary in her first year and then payment of 25-75% of the Association of American Medical Colleges average compensation for Maternal Fetal Medicine attending physicians working the same percent clinical effort.

206.    This adjustment to the average never occurred. As a result, Defendants have wrongfully withheld from Relator more than $1 million of compensation.

207.    Defendants also intentionally miscalculated Relator's percent effort.

208.    For example, Relator was contractually committed to spend 25-40% of her time working clinically (clinical full time equivalent or cFTE), 5% of her time teaching, 45% of her time on research, and 10% of her time on institutional service. Her clinical compensation was dependent on reaching productivity targets which were to be adjusted to her cFTE.

36

209.    However, Dr. Silverman and OB/GYN Associates intentionally and repeatedly miscalculated Relator's expected clinical contributions by applying an inflated and inaccurate cFTE threatening and then reducing her MSG compensation when her clinical productivity was below the 75%ile of this wrongfully inflated benchmark.

210.    In September 2017, Relator took FMLA leave for reasons unrelated to the allegations set out here.

211.    Dr. Silverman and OB/GYN Associates wrongly refused to pay her any compensation while she was on leave despite her entitlement to full compensation for most of the time she was on leave.

212.    Then, upon her return to work, Dr. Silverman and OB/GYN Associates again wrongly refused to pay the MSG component of her compensation for at least several additional days.

213.    Finally, on May 31, 2018, Relator was constructively discharged from her clinical duties.

214.    Defendants have refused to pay her since that date and have also cancelled her malpractice insurance coverage.

**C.    Sham peer review activity**

215.    In addition to the direct harassment, changes to working conditions, and withheld salary set out above, Defendants abused the peer review and credentialing system in an attempt to silence Relator.

37

216.    Again, Dr. Silverman led the charge by making false allegations to the Crouse peer review system that Relator had engaged in deficient patient care.

217.    In some instances, these false allegations were rather obviously fabricated.

218.    For example, in one instance, Dr. Silverman reported false and made up test results and then alleged Relator's care was deficient in light of the fake test results.

219.    A review of the patient's chart would have quickly revealed the obvious fabrications.

220.    Relator's patient care has been repeatedly and uniformly determined to be appropriate.

221.    While sham peer review reports are obviously distressing, risky, and harassing for physicians, these false reports served double duty.

222.    By making false reports, Dr. Silverman was able to enlist Upstate and the Crouse Entities in his attempts to hide Defendants' bad conduct.

223.    Even after Dr. Bernstein was cleared of the frivolous charges Dr. Silverman lodged at Crouse hospital, he reported his unsubstantiated allegations to individuals working at Upstate, effectively smearing Dr. Bernstein's exemplary clinical record and lessening the impact of Dr. Bernstein's voiced concerns regarding Dr. Silverman's ongoing deficient and dangerous clinical care and fraudulent billing practices.

224.    These sham reports are best understood as a failed attempt to silence Dr. Bernstein and restrict her access to the EMR and other electronic patient records which could shed further light on Defendants' bad acts.

**D.** **Other attempts to hide the facts**

225. Defendants took other steps to hide evidence of their wrongdoing including:

   a. sham security reports;

   b. changes to the perinatal conferences; and

   c. relocating maternal death data.

   *i.* *Sham security reports*

226. In addition to misusing the hospital peer review system in a thwarted attempt to restrict Relator's access to records and reduce her credibility, Dr. Silverman made false reports to Upstate's labor relations department, the Upstate University Police Department, and Crouse's security team.

227. Within weeks of Upstate's April 2019 decision to permit the SMFM practice review Relator had been advocating, Dr. Silverman orchestrated false reports to Upstate's labor relations department that Relator had threatened his life – she had not.

228. Again, the timeline of events indicates these actions were taken to further restrict Relator's access to evidence of Defendants' wrongdoing.

229. This time, upon receipt of Dr. Silverman's false allegations Upstate hospital restricted Relator's access to patient care facilities and removed her access to the EMR and incident reporting systems.

230. These events occurred at the same time Relator had been discussing her concerns about dangerous patient and billing fraud with Upstate's Chief Medical Officer.

231.    As a result of Dr. Silverman's false report, Relator's access to Upstate facilities and EMR were restricted.

232.    Because most, if not all, of the Upstate outpatient mothers eventually deliver their babies at Crouse, the vast majority of the Upstate medical records can be accessed through the Crouse EMR to which Relator still had access.

233.    Knowing this, Dr. Silverman made additional false allegations against Relator to Crouse Hospital.

234.    For example, he directly and falsely reported to Crouse security that Relator's clinical privileges had been revoked at both Upstate and Crouse hospitals and that she was being investigated by the state medical board.

235.    These were knowing and purposeful lies which set the stage for his most audacious lie: that upon learning of her revoked privileges and the medical board investigation – neither of which were true or occurred – Dr. Bernstein threatened the life of Dr. Silverman and Mark Gilbert, a member of the administrative staff.

236.    Dr. Bernstein has never made any such threats and the allegedly inciting events, the privileges revocation and medical board investigation, never occurred.

237.    Relator's privileges have never been restricted and Dr. Silverman knew that because he was the physician leader at both hospitals responsible for Relator's credentialing.

238.    Physician privileges information is readily available for verification.

239.    But, instead of immediately checking and dismissing Dr. Silverman's obvious lie, the Crouse Entities collaborated with Dr. Silverman and restricted Relator's access to Crouse facilities and the EMR for three months.

240.    For a period of time, Relator's picture was on display at building security.

241.    Around this time, Dr. Silverman filed a false police report that repeated the false allegations that Relator had threatened his life.

242.    The local District Attorney's office rejected Dr. Silverman's request to obtain an order of protection after concluding nothing actionable had been reported.

243.    Defendants took other actions calculated to restrict access to proof of their frauds.

244.    For example, after Dr. Bernstein made a written complaint about Dr. Silverman to Crouse Hospital, her access to the Crouse EMR was terminated.

ii.    *Changes to mini-conferences*

245.    Dr. Silverman canceled at least one of the perinatal conferences described above. The same series of conferences at which his deficient and dangerous patient care and false medical records were being revealed to his peers.

246.    Then he and Upstate functionally ended them.

247.    The ultrasound coordinator who had done the work of setting up the conferences and choosing medically appropriate cases to discuss was reassigned and an administrative assistant was tasked with picking patients to discuss.

41

### *iii.*     *Morbidity and mortality records moved*

248.     Under Dr. Silverman's leadership, the Upstate and Crouse obstetrics departments have unusually high maternal morbidity and mortality rates.

249.     For 20-30 years, this data was stored on the Upstate computer system and maintained by an Upstate employee.

250.     Around the time Upstate agreed to the SMFM practice review, Dr. Silverman moved the department's morbidity and mortality records off of Upstate's computer system and placed them on a Crouse system.

## CAUSES OF ACTION

**COUNT I**
**Violations of the False Claims Act: Presenting or Causing a False Claim**
**(31 U.S.C. § 3729(a)(1)(A))**
**(All Defendants)**

251.     The foregoing allegations are repeated and realleged as if fully set forth herein.

252.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval.

253.     Defendants knowingly and willfully violated the False Claims Act by presenting, or causing to be presented, false claims for payment or approval.

254.     Specifically, for at least the last five years, Defendants presented, or caused to be presented, medical bills to Government Healthcare Programs including Medicare,

Medicaid, and Tricare seeking payment for services that were not reasonably medically necessary, were rendered incompetently, rendered incompletely, or not rendered at all.

255.    All Defendants knew or should have known (as defined in 31 U.S.C. § 3801(a)(5)) that they have for years made, presented, or submitted, or caused to be made, false or fraudulent claims for payment to Government Healthcare Programs.

256.    Each of the claims submitted or caused to be submitted by the Defendants is a separate false and fraudulent claim.

257.    The Defendants presented or caused to be presented these claims knowing their falsity, or in deliberate ignorance or reckless disregard that such claims were false.

258.    The United States was unaware of the foregoing circumstances and conduct of the Defendants and, in reliance on said false and fraudulent claims, authorized payments to be made to the Defendants, made such payments, and has been damaged.

259.    Because of these false or fraudulent claims submitted or caused to be submitted by Defendants, the United States has been damaged in an amount to be determined at trial.

**COUNT II**
**Violations of the False Claims Act: Making, Using, or Causing to be Used a False**
**Record or Statement**
**(31 U.S.C. § 3729(a)(1)(B))**
**(All Defendants)**

260.    The foregoing allegations are repeated and realleged as if fully set forth

herein.

261.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), imposes liability upon those

who knowingly make, use, or cause to be made or used, false records or statements

material to a false or fraudulent claim.

262.    Defendants knowingly and willfully violated the False Claims Act by

making, using, or causing to be made or used, false records or statements material to

false or fraudulent claims.

263.    Specifically, for purposes of obtaining or aiding to obtain payment or

approval of reimbursement claims made to Government Healthcare Programs, for at

least the last five years the Defendants made or presented, or caused to be made or

presented, to the United States false or fraudulent records, knowing these records to be

false or fraudulent, or acting with reckless disregard or deliberate ignorance thereof.

264.    Each medical record, bill, and invoice submitted to the government in

support of Defendants' above-described false claims is a separate false record or

statement and separate violation of 31 U.S.C. § 3729(a)(1)(B).

265.    The United States was unaware of the foregoing circumstances and

conduct of the Defendants and, in reliance on said false and fraudulent records,

44

authorized payments to be made to the Defendants, made such payments, and has been damaged.

266.    Because of these false or fraudulent statements submitted or caused to be submitted by Defendants, the United States paid the claims, resulting in damages to the United States in an amount to be determined at trial.

## COUNT III
## Violations of the False Claims Act: Conspiring to Violate the False Claims Act
## (31 U.S.C. § 3729(a)(1)(C))
## (All Defendants)

267.    The foregoing allegations are repeated and realleged as if fully set forth herein.

268.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(C), imposes liability upon those who conspire to commit a violation of another sub-section of the False Claims Act.

269.    Defendants knowingly, in reckless disregard, and/or in deliberate ignorance of the truth conspired between themselves, with their employees and administrators, and others, to violate the False Claims Act.

270.    Defendants conspired to submit false and fraudulent claims related to ultrasonography and nonstress testing conducted, or at least partially performed, at Upstate and Crouse Hospitals.

271.    Defendants did in fact submit false and fraudulent claims for testing that was not competently or completely performed.

272.    As a consequence of their conspiracies, the United States paid these claims when it would not have but for Defendants' unlawful conduct.

273.    As a result of this conspiracy, and the resulting false or fraudulent claims submitted or caused to be submitted by Defendants, the United States paid the claims, resulting in damages to the United States in an amount to be determined at trial.

## COUNT IV
## Violations of the False Claims Act: Retaliation
## (31 U.S.C. § 3730(h))
## (All Defendants)

274.    The foregoing allegations are repeated and realleged as if fully set forth herein.

275.    The False Claims Act, 31 U.S.C. § 3730(h), makes it unlawful to retaliate against a person who takes actions to stop a violation of the False Claims Act.

276.    As more particularly described above, Relator was engaged in activity protected by the False Claims Act when she repeatedly reported Defendants' dangerous and fraudulent medical and billing practices and refused to participate in their scheme.

277.    Relator informed Defendants on multiple occasions, both orally and in writing, that she believed Defendants were engaging in fraudulent conduct.

278.    As a direct result of Relator having lawfully investigated and reported to her superiors what she believed to be fraudulent conduct or wrongdoing, Defendants threatened, harassed, and/or discriminated against Relator in the terms and conditions of her employment in violation of 31 U.S.C. § 3730(h).

46

279.    As a direct result of these unlawful retaliatory employment practices and in violation of 31 U.S.C. §3730(h), Relator sustained permanent and irreparable harm, resulting in her constructive discharge from the MSG, diminution of her clinical and professional reputation, reduced opportunities to treat patients and earn income, generally a loss of earnings, benefits, future earning power, front and double back pay and interest due thereon.

## COUNT VI
## Violations of the New York False Claims Act: Presenting or Causing a False Claim
## (State Fin. Law § 189(1)(a))
## (All Defendants)

280.    The foregoing allegations are repeated and realleged as if fully set forth herein.

281.    The New York False Claims Act, State Fin. Law § 189(1)(a), imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval.

282.    Defendants knowingly and willfully violated the New York False Claims Act by presenting, or causing to be presented, false claims for payment or approval.

283.    Specifically, for at least the last five years, Defendants submitted, or caused to be submitted, medical bills to Government Healthcare Programs, including state funded programs like Medicaid, seeking payment for services that were not reasonably medically necessary, were rendered incompetently, rendered incompletely, or not rendered at all.

284.    All Defendants knew or should have known (as defined in State Fin. Law § 188(3)) that they have for years made, presented, caused to be presented, false or fraudulent claims for payment to Government Healthcare Programs.

285.    Each of the claims submitted or caused to be submitted by the Defendants is a separate false and fraudulent claim.

286.    The Defendants presented or caused to be presented these claims knowing their falsity, or in deliberate ignorance or reckless disregard that such claims were false.

287.    The State of New York was unaware of the foregoing circumstances and conduct of the Defendants and, in reliance on said false and fraudulent claims, authorized payments to be made to the Defendants, made such payments, and has been damaged.

288.    Because of these false or fraudulent claims submitted or caused to be submitted by Defendants, the State of New York has been damaged in an amount to be determined at trial.

**COUNT VII**
**Violations of the New York False Claims Act: Making, Using, or Causing to be Made
or Used a False Record or Statement**
**(State Fin. Law § 189(1)(b))**
**(All Defendants)**

289.   The foregoing allegations are repeated and realleged as if fully set forth

herein.

290.   The New York False Claims Act, State Fin. Law § 189(1)(b), imposes liability

upon those who knowingly make, use, or cause to be made or used, false records or

statements material to a false or fraudulent claim.

291.   Defendants knowingly and willfully violated the New York False Claims Act

by making, using, or causing to be made or used, false records or statements material to

false or fraudulent claims.

292.   Specifically, for purposes of obtaining or aiding to obtain payment or

approval of reimbursement claims made to Government Healthcare Programs, including

state funded programs like Medicaid, for at least the last five years the Defendants

made or presented, or caused to be made or presented, to the State of New York false

or fraudulent records, knowing these records to be false or fraudulent, or acting with

reckless disregard or deliberate ignorance thereof.

293.   Each medical record, bill, and invoice submitted to the government in

support of Defendants' above-described false claims is a separate false record or

statement and separate violation of State Fin. Law § 189(1)(b).

294.    The State of New York was unaware of the foregoing circumstances and conduct of the Defendants and, in reliance on said false and fraudulent records, authorized payments to be made to the Defendants, made such payments, and has been damaged.

295.    Because of these false or fraudulent statements submitted or caused to be submitted by Defendants, the United States paid the claims, resulting in damages to the State of New York in an amount to be determined at trial.

### COUNT VIII
### Violations of the New York False Claims Act: Conspiring to Violate the New York False Claims Act
### (State Fin. Law § 189(1)(c))
### (All Defendants)

296.    The foregoing allegations are repeated and realleged as if fully set forth herein.

297.    The New York False Claims Act, State Fin. Law § 189(1)(c), imposes liability upon those who conspire to commit a violation of another sub-section of the New York False Claims Act.

298.    Defendants knowingly, in reckless disregard, and/or in deliberate ignorance of the truth conspired between themselves, with their employees and administrators, and others, to violate the False Claims Act.

299.    Defendants conspired to submit false and fraudulent claims related to ultrasonography and nonstress testing conducted, or at least partially performed, at Upstate and Crouse Hospitals.

50

300.    Defendants did in fact submit false and fraudulent claims for testing that was not competently or completely performed.

301.    As a consequence of their conspiracies, the United States paid these claims when it would not have but for Defendants' unlawful conduct.

302.    As a result of this conspiracy, and the resulting false or fraudulent claims submitted or caused to be submitted by Defendants, the State of New York paid the claims, resulting in damages to the State of New York in an amount to be determined at trial.

### COUNT IX
### Violations of the New York False Claims Act: Retaliation
### (State Fin. Law § 191)
### (All Defendants)

303.    The foregoing allegations are repeated and realleged as if fully set forth herein.

304.    The New York False Claims Act, State Fin. Law § 191, makes it unlawful to retaliate against a person who takes actions to stop a violation of the New York False Claims Act.

305.    As more particularly described above, Relator was engaged in activity protected by the New York False Claims Act when she repeatedly reported Defendants' dangerous and fraudulent medical and billing practices and refused to participate in their scheme.

306.    Relator informed Defendants on multiple occasions, both orally and in writing, that she believed Defendants were engaging in fraudulent conduct.

307.    As a direct result of Relator having lawfully investigated and reported to her superiors what she believed to be fraudulent conduct or wrongdoing, Defendants threatened, harassed, and/or discriminated against Relator in the terms and conditions of her employment in violation of State Fin. Law § 191.

308.    As a direct result of these unlawful retaliatory employment practices and in violation of State Fin. Law § 191, Relator sustained permanent and irreparable harm, resulting in her constructive discharge, diminution of her clinical and professional reputation, reduced opportunities to treat patients and earn income, generally a loss of earnings, benefits, future earning power, front and double back pay and interest due thereon.

**Count X**
**Retaliation in Violation of New York State Whistleblower Law**
**(Labor Law § 740/741)**
**(All Defendants)**

309.    The foregoing allegations are repeated and realleged as if fully set forth herein.

310.    Defendants committed retaliatory acts against Dr. Bernstein in violation of New York State laws providing protection to whistleblowers.

311.    Defendants are liable to Dr. Bernstein under, *inter alia*, New York Labor Law § 740 and/or §741.

312.    Defendants' improper activities constituted "health care fraud" under Labor Law N § 740, *et seq.*

313.    Defendants' improper activities included activities that Dr. Bernstein, in good faith, reasonably believes constitute improper quality of patient care under Labor Law § 741, *et seq.*

314.    Dr. Bernstein objected to, refused to participate in and/or threatened to disclose Defendants' improper activities.

315.    Dr. Bernstein afforded Defendants a reasonable opportunity to correct their improper activities, but Defendants failed and refused to do so and/or Dr. Bernstein reasonably believes in good faith that reporting to Defendants' would not result in corrective action.

316.    Dr. Bernstein is thus entitled to (i) an injunction to restrain Defendants' continued retaliation; (ii) reinstatement to the same position held before Defendants' retaliatory actions, or an equivalent position; (iii) reinstatement of full fringe benefits and seniority rights; (iv) compensation for lost wages, benefits and seniority rights; (v) wages, benefits and other remuneration; (vi) the payment by the employer of reasonable costs, disbursements, and attorney's fees; and (vii) such other and further relief as the Court may deem just and proper.

**WHEREFORE, Relator, on behalf of herself as well as the United States and the State of New York, requests the following relief:**

a. A judgment against Defendants in an amount equal to all damages due to the Government, including treble damages, under the FCA and/or NYFCA;

b. A judgment against Defendants for all civil penalties due to the Government for each of Defendants' violations of the FCA and/or NYFCA;

c. That Relator recover all costs of this action, with interest, including the cost to the Government for its expenses related to this action;

d. That Relator be awarded all reasonable attorneys' fees in bringing this action;

e. That in the event the United States Government proceeds with this action, Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

f. That in the event the United States Government does not proceed with this action, Relator be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

g. An award to Relator on his retaliation claims including double back pay; interest on back pay; an award of front pay; special damages; an injunction restraining further retaliation; reinstatement of Relator's position; reinstatement of full fringe benefits and seniority rights; compensation for lost wages, benefits and seniority rights; and wages, benefits and other remuneration;

h. That a trial by jury be held on all issues so triable;

i. An award of pre- and post-judgment interest; and

j. Such other and further relief to Relator and/or the United States of America and/or the State of New York as this Court may deem just and proper.

## REQUEST FOR TRIAL BY JURY

Under Rule 38 of the Federal Rules of Civil Procedure, Relator hereby requests a

trial by jury.


Dated: June 6, 2020

By:   _____

Jonathan Ferris Bar Number: 519000
Attorney for Plaintiff Relator
(Local Counsel)
Thomas & Solomon LLP
693 East Avenue
Rochester, NY
Tel:    (585) 272-0540
Fax:    (585) 272-0574
Email: jferris@theemploymentattorneys.com


Darth M. Newman NY Bar Number: 5682687
Attorney for Plaintiff Relator
(Lead Counsel, Motion for Admission
Forthcoming)
Law Offices of Darth M. Newman LLC
1140 Thorn Run Rd, # 601
Coraopolis, PA 15108
Telephone:    412-436-3443
Email:         darth@dnewmanlaw.com