**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**HELENE BERNSTEIN, et al.,**

                                        **Plaintiffs,**

        **vs.**
                                                                **5:20-CV-630**
                                                                **(MAD/CFH)**

**ROBERT SILVERMAN, et al.,**
**UNIVERSITY OB/GYN ASSOCIATES, INC.**
**CROUSE HEALTH HOSPITAL, INC.,**
**and CROUSE HEALTH SYSTEM, INC.,**

                                        **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**OFFICE OF THE UNITED STATES**            **CARL G. EURENIUS, AUSA**
**ATTORNEY, SYRACUSE**
100 South Clinton Street
Syracuse, New York 13261-7198
Attorney for Plaintiffs

**OFFICE OF THE NEW YORK STATE**          **EMILY L. AULETTA, AAG**
**ATTORNEY GENERAL**
The Capitol
Albany, New York 12224
Attorney for Plaintiffs United States
of America and the State of New York

**DARTH M. NEWMAN, LLC**                  **DARTH M. NEWMAN, ESQ.**
1140 Thorn Run Rd
Suite 601
Coraopolis, Pennsylvania 15108
Attorney for Plaintiff Relator

**THOMAS & SOLOMAN, PLLC**                **JONATHAN W. FERRIS, ESQ.**
693 East Avenue
Rochester, New York 14607
Attorney for Plaintiff Relator

**BARCLAY DAMON, LLP**                    **DAVID G. BURCH, JR., ESQ.**

1

Barclay Damon Tower                              **KYRA GANSWITH, ESQ.**
125 East Jefferson Street
Syracuse, New York 13202
Attorneys for Defendant Robert Silverman


**LIPPES MATHIAS, LLP**                          **LAURA L. SPRING, ESQ.**
507 Plum Street                                  **ALLISON BELLE CHERUNDOLO, ESQ.**
Suite 310
Syracuse, New York 13204
Attorneys for Defendant University
OB/GYN Associates, Inc.

**MCDERMOTT WILL & EMERY**                        **LAURA MCLANE, ESQ.**
28 State Street
Boston, Massachusetts 02109-1775
Attorney for Defendants Crouse
Health Hospital, Inc., and Crouse
Health System, Inc.


**MCDERMOTT WILL & EMERY**                        **NATASHA L. DOBROTT, ESQ.**
200 Clarendon Street                             **MEGAN CORRIGAN, ESQ.**
Suite 58
Boston, Massachusetts 02116
Attorneys for Defendant Crouse
Health Hospital, Inc., and Crouse
Health System, Inc.


**MCDERMOTT WILL & EMERY**                        **STACY A. LUTKUS, ESQ.**
One Vanderbilt Avenue
New York, New York 10017
Attorney for Defendant Crouse
Health Hospital, Inc.


**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

2

On May 6, 2020, Plaintiff and Relator Helene Bernstein, M.D., Ph.D., ("Relator") commenced this *qui tam* action on behalf of the United States of America and the State of New York (collectively "Plaintiffs") asserting that Defendants University OB/GYN Associates ("University OB/GYN"), Crouse Health Hospital and Crouse Health System (together "Crouse") (collectively "Entity Defendants"), and Robert Silverman, M.D. ("Dr. Silverman") (collectively "Defendants") submitted, or caused to be submitted, materially false bills for medical services which were not performed.  *See* Dkt. No. 1.  Relator also brought claims on her own behalf asserting that Defendants retaliated against her for reporting, attempting to stop, and refusing to participate in Defendants' dangerous and fraudulent patient care.  *See id.*  On July 28, 2023, Defendants filed motions to dismiss.  *See* Dkt. Nos. 58, 59, 60.  On December 15, 2023, Relator filed an amended complaint.  *See* Dkt. No. 74.

In her amended complaint, Relator asserts the following ten claims against Defendants: (1) presenting false claims for payment under the False Claims Act (the "FCA"), 31 U.S.C. § 3729(a)(1)(A); (2) making false statements under the FCA, 31 U.S.C. § 3729(a)(1)(B); (3) conspiring to violate the FCA in violation of 31 U.S.C. § 3729(a)(1)(C); (4) presenting false claims for payment under the New York False Claims Act (the "NYFCA"), codified at Finance Law § 189(1)(a); (5) making false statements under the NYFCA, codified at Finance Law § 189(1)(b); (6) conspiring to violate the NYFCA in violation of New York Finance Law § 189(1)(c); (7) retaliation in violation of 31 U.S.C. § 3730(h); (8) retaliation in violation of New York Finance Law § 191; (9) a claim for retaliation in violation of New York Labor Law §§ 740, 741; and (10) filing reverse false claims in violation of 31 U.S.C. § 3729(a)(1)(G).  *See* Dkt. No. 1.

On January 9, 2024, University OB/GYN, Crouse, and Dr. Silverman filed motions to dismiss Relator's claims.  *See* Dkt. Nos. 83, 84, 86.  On January 30, 2024, Relator filed a response in opposition.  *See* Dkt. No. 88.  On February 6, 2024, Defendants each filed a reply.  *See* Dkt. Nos. 91, 92, 93.  Relator filed a sur-reply on February 23, 2024.  *See* Dkt. No. 100.  Presently before the Court are Defendants' motions to dismiss.

## II. BACKGROUND

**A.      The Parties**

According to the amended complaint, Relator is a M.D., Ph.D. who is dual board certified in Obsterics and Gynecology and Maternal Fetal Medicine.  *See* Dkt. No. 74 at ¶ 13.  Relator "joined the Upstate University Medical School faculty in October 2015 as the Division Director of Maternal Fetal Medicine and was an Associate Professor of Obstetrics and Gynecology and an Associate Professor of Microbiology and Immunology."  *Id.* at ¶ 14.  Relator had tenure at Upstate University Medical School until May 2021, and held clinical privileges at Upstate University Hospital and Crouse Hospital through fall of 2021.  *See id.* at ¶¶ 15, 16.  "[S]he served as a member of the Coding Committee for the Society for [M]aternal-Fetal Medicine from 2019-2022."  *Id.* at ¶ 22.  As a member of the Coding Committee, Relator helped to decide "what is and is not proper coding/billing behavior within her specialty[.]"  *Id.* at ¶ 23.  Relator and other Maternal Fetal Medicine ("MFM") doctors "worked at the regional perinatal center housed at Upstate but they were responsible for seeing and treating patients at Upstate and at Crouse Hospital[.]"  *Id.* at ¶ 312.  Relator "performed medical services in the name of, on behalf of, and on the premises of each of the Entity Defendants all while and under the supervision and control of Dr. Silverman."  *Id.* at ¶ 331.  Relator alleges that each Defendant was an employer of hers, or, alternatively, that she was an agent of each Defendant.  *See id.* at ¶¶ 329-30.

Defendant Dr. Silverman "is the former Division Director of Maternal Fetal Medicine at Upstate University Hospital and a board certified Maternal Fetal Medicine physician" who was acting as a representative and agent of University OB/GYN, Upstate Medical University ("Upstate"), and Crouse.  *Id.* at ¶¶ 24, 25.  Dr. Silverman was promoted to Chair of Obstetrics and Gynecology at Upstate before Relator was hired.  *See id.* at ¶ 26.  Dr. Silverman was in charge of patient safety and medical quality for Obstetrics and Gynecology at Crouse Hospital and Upstate. *See id.* at ¶ 29.  He also held the positions "Professor, Chairman, and Director of the Division of Maternal-Fetal Medicine and the Department of Obstetrics and Gynecology at Upstate; and Chairman of the Department of Obstetrics and Gynecology and Director of the Regional Perinatal Program a joint program existing at Upstate Medical University and Crouse Hospital."  *Id.* at ¶ 28.  Dr. Silverman was the "longtime president of [University] OB/GYN [], the physician services entity, known as medical services group ('MSG'), that bills for provider services performed by Upstate Medical University affiliated Obstetrics and Gynecologic providers (including Upstate and Crouse) and then compensates physicians with the majority of their salary."  *Id.* at ¶ 30.  Dr. Silverman was the president of University OB/GYN until May 31, 2020.  *See id.* at ¶ 37.  Relator alleges that Dr. Silverman was her employer, had the "power to hire and fire" her, "personally signed the offer letter which effectuated" hiring her, and "personally supervised her, controlled her titles, working conditions including hours and schedules, and compensation."  *Id.* at ¶ 319.

Relator's claims are based on her allegations that Dr. Silverman has been falsely attesting to reading, interpreting, and evaluating the results of ultrasound and fetal nonstress tests ("NSTs") ordered for patients and billing for them.  *See* Dkt. No. 74 at ¶¶ 31, 32.  Failing to read the results while nevertheless billing for them "expos[es] women and fetuses to the unnecessary risk of a gap in their medical care."  *Id.* at ¶ 191.  Relator also alleges that Dr. Silverman has "used his

leadership positions" to retaliate against people who raised concerns that he was engaging in fraudulent and dangerous practices. *Id.* at ¶ 34.

Defendant University OB/GYN is a not-for-profit corporation incorporated in the State of New York with a principal place of business in Syracuse, New York. *See id.* at ¶ 35. University OB/GYN "is a physician services entity which bills and collects revenue for physician services performed by Upstate Medical University affiliated Obstetric and Gynecologic providers including at Upstate and Crouse Hospitals." *Id.* at ¶ 36. University OB/GYN "submits or causes to be submitted" bills on behalf of Dr. Silverman for study reading, evaluation, and management services. *Id.* at ¶ 39. Relator alleges that some of these bills are materially false because Dr. Silverman never performed the services. *See id.* Relator also alleges that University OB/GYN retaliated against her by "restricting and withholding her compensation." *Id.* at ¶ 40.

Relator was a member of University OB/GYN during her employment at Upstate and Crouse Hospital, as required by the Upstate bylaws. *Id.* at ¶ 38. University OB/GYN was one of Relator's employers, maintained employment records on her, and controlled the majority of her compensation. *See id.* at ¶¶ 322-23. Relator was required to be employed by, and associated with, University OB/GYN in order to perform services at Upstate and Crouse Hospital. *See id.* at ¶ 324.

Upstate, Crouse, and University OB/GYN jointly control the regional perinatal program. *See id.* at ¶ 313. All non-physician staff at the regional perinatal center are employed by Upstate and Upstate subsequently charges University OB/GYN for the use of its staff and physical resources. *See id.* at ¶ 314. Upstate's Governing Board provides governance and oversight over clinical medicine and the various Medical Services Groups, including University OB/GYN. *See id.* at ¶ 315. Money collected at University OB/GYN is distributed to Upstate and Crouse and

Crouse contributes to the salaries of University OB/GYN physicians pursuant to contractual agreements with University OB/GYN.  *See id.* at ¶¶ 316-17.

Defendants Crouse Health Hospital and Crouse Health System are both not-for-profit corporations incorporated in the State of New York with a principal place of business in Syracuse, New York.  *See id.* at ¶¶ 41, 45.  Crouse Health Hospital and Crouse Health Systems own or control Crouse Hospital and are "ultimately responsible for submitting, or causing to be submitted, the bills for the technical (facility fee) component of the fetal nonstress tests Dr. Silverman falsely attests to completing."  *Id.* at ¶¶ 42, 46.  Crouse has a contract with University OB/GYN that requires University OB/GYN "to provide obstetric, gynecological, and MFM care at Crouse Hospital" and requires Crouse Hospital to pay University OB/GYN for providing those services.  *Id.* at ¶ 43.  University OB/GYN and Crouse Hospital share grant monies.  *See id.* at ¶ 44.  "Approximately 70% of bills generated by the Upstate and Crouse Maternal Fetal Medicine practice are directed to one of several Government Healthcare Programs."  *Id.* at ¶ 97.  "All outpatient services are performed at Upstate and all inpatient services, including labor and delivery, are provided at Crouse."  *Id.* at ¶ 177.  A physician would be dismissed from University OB/GYN and no longer able to work at Upstate if she were unable to practice medicine at Crouse Hospital.  *See id.* at ¶ 328.

Relator alleges that Crouse also employed her, maintained records related to the clinical care she performed on their behalf and at their facilities, and had "a sufficient and significant measure of control" over her employment and compensation through the contractual arrangements with Upstate and University OB/GYN.  *Id.* at ¶ 326.  Crouse controlled Relator's "privileges to perform medicine within Crouse Hospital" and, through its contracts with University OB/GYN, also controlled her "ability to recover compensation for those services."  *Id.* at ¶ 327.

**B.     Billing Procedures**

Ultrasounds generate "charges for physician services (wRVU)" and a "significantly larger" "technical or facility fee (tRVU)[.]"  *Id.* at ¶ 113.  More than half of MFM physicians' income at University OB/GYN is derived from ultrasound procedures.  *See id.* at ¶¶ 110-11.  Physicians and their billing facility make more money when they bill for more procedures.  *See id.* at ¶ 112.  Relator alleges that Dr. Silverman and Entity Defendants "have a pecuniary interest in performing, and billing, as many nonstress tests as possible [because m]ore billed tests equal more facility and physician revenue."  *Id.* at ¶ 192.  "Dr. Silverman continually touts his record as the lead income generator within the Obstetrics and Gynecology department."  *Id* at ¶ 112.  Both ultrasounds and NSTs "generate more revenue per bill for the facilities than they do for the physicians."  *Id.* at ¶ 193.

University OB/GYN bills for personal services and patient interactions whereas Crouse bills for the facility component of each procedure and for the patient interaction at Crouse.  *See id.* at ¶ 220.  Upstate, Crouse, and University OB/GYN "exist at least in part to bill and receive payment for the medical services performed under their respective aegises" and Entity Defendants all bill for their services electronically.  *Id.* at ¶¶ 208-09.  After a medical service provider completes a patient chart by clicking the button in the electronic medical record ("EMR") attesting that the services were performed, the electronic billing system automatically routes a bill for the services provided to either an insurance program — private or government — or to a private payor.  *See id.* at ¶ 210.  At Upstate, the EMR is "prepopulated with billing codes based on the study that had been ordered" at Upstate, such that the study is automatically billed after it is signed.  *Id.* at ¶ 211.  Defendants use an EMR called Epic which requires a provider to take action to prevent a patient encounter or imaging study from being billed and prevents closing a chart

without billing. *See id.* at ¶¶ 212-13. Physicians who delay completing their charts and applying their attestation "receive corrective communications from the relevant Entity Defendant encouraging them to complete the chart(s) so they may be billed" and "can be punished financially" by some of the Entity Defendants if they habitually delay. *Id.* at ¶¶ 226-27.

"At Upstate, signing or applying an attestation to an imaging study chart automatically triggers the bill, thus signing a chart or study is equivalent to billing that chart or study" for all insurers and payors. *Id.* at ¶¶ 214-15. The billing system is "substantially similar" at Crouse Hospital, where the physicians apply an electronic signature to an imaging study chart and that signature automatically triggers billing. *Id.* at ¶ 214. At Crouse, bills for the professional services component of an NST review are submitted after a physician "completes a paper billing form" detailing the services performed and places it in a basket for University OB/GYN. *Id.* at ¶¶ 217-18. University OB/GYN then collects that form, converts it to an electronic bill, and then transmits it to the relevant payor. *See id.* Those paper billing forms do not contain insurance or payor information. *See id.* at ¶ 219.

Physicians generally do not have access to final billing paperwork on their patients, although University OB/GYN "would occasionally provide individual physicians a summary of the total number of procedures and dollars billed in their name." *Id.* at ¶ 221. Therefore, "detailed billing information is solely and uniquely within the possession, custody, and control of the Entity Defendants" and the billing staff are not privy to the details of the patient care and have "no way to determine which of the charts they interact with are tainted by the false claims at issue here." *Id.* at ¶¶ 222-23. Billing department staff would not have access to the computer systems necessary to challenge or verify the accuracy of tests which physicians attested to reviewing. *See id.* at ¶ 224.

**C.      Maternal Fetal Tests**

Relator alleges that Defendants made false claims related to two different types of

maternal fetal tests which are performed bedside by non-physician staff: ultrasonography and fetal

NSTs.  *Id.* at ¶¶ 98-99.  Fetal NSTs are administered in both the out- and inpatient settings.  *See*

*id.* at ¶ 178.  "A fetal nonstress test consists of 20 minutes of uninterrupted fetal heart rate

monitoring conducted without external stressors.  The resulting heart rate tracing is not all that

dissimilar from the output of an EKG."  *Id.* at ¶ 173.  "Nonstress test results are used to determine

whether a patient should receive additional testing, can be continued to be managed [as an

inpatient], or requires intervention with rare cases considered for immediate delivery."  *Id.* at ¶

190.  They are usually "ordered for fetuses at increased risk of distress."  *Id.* at ¶ 189.  "[T]hese

studies can help save the life of baby and mother, indicate the need for immediate and urgent

surgery or delivery, trigger hospice planning, prevent unwarranted and futile surgery, and inform

expectant mothers about their medical and reproductive risks."  *Id.* at ¶ 103.  On the other hand,

"misuse of the studies can result in missed diagnoses, incorrect diagnoses, and inappropriate

management leading to wrongful births, unnecessary surgical interventions, fetal demise,

maternal injury, and substantial psychological harm."  *Id.* at ¶ 104.  The fetal NSTs are performed

by a technician or nurse and require a physician to interpret the results, known as a tracing.  *See*

*id.* at ¶ 174.  Physician review of study images is necessary to "accurately diagnose and manage a

host of fetal abnormalities," and improper evaluation of the images can lead "to serious and

preventable patient harm."  *Id.* at ¶ 127.  "Some conditions diagnosable with advanced

ultrasonography have the potential to impact future pregnancies of the woman as well as

genetically related family members."  *Id.* at ¶ 146.

Fetal images and fetal heart rate tracings from the ultrasonography and fetal NSTs are

"provided to the attending physician to be read, interpreted, evaluated, and correlated with each patient's clinical course" and assist in diagnosing and managing maternal and fetal complications. *Id.* at ¶¶ 100-02.  Physicians at Crouse interpret the NSTs by logging into a digital system which logs the date, time, and identity of the viewer.  *Id.* at ¶¶ 184-85.  NSTs at Upstate are printed, reviewed analogue, and signed by the reviewing physician placing a sticker on the file.  *Id.* at ¶¶ 179-83.

"Ultrasonography is used in obstetrics care to confirm fetal number and viability, placentation, gestational age and screen for fetal abnormalities."  *Id.* at ¶ 106.  General obstetrician gynecologists must have advanced training to perform an "[a]dvanced ultrasonography (CPR 76811) [which] is the more complicated and detailed version of this service performed virtually exclusively by maternal fetal medicine and radiologist physicians" and "offers a higher level of diagnostic, prognostic, and management accuracy."  *Id.* at ¶¶ 107-08.

At Upstate University Hospital a "technician operates the ultrasound machine and captures images and video clips of an expectant mother's womb and baby" and performs the imaging on an outpatient basis.  *See id.* at ¶¶ 114-15.  The images are "uploaded to a system called PACS (picture archiving and communications system) for later evaluation by an attending physician." *Id.* at ¶ 116.  PACS "records the date, time, and duration a physician spends viewing pictures" within a particular study packet and the user identity of the person accessing the images.  *Id.* at ¶¶ 117, 123.  Evaluating and reviewing the pictures takes between five and twenty minutes for an experienced physician because cases have varying levels of difficulty to review.  *See id.* at ¶¶ 118-19.  After reviewing and evaluating images, the attending physician must complete and validate the study report in Clickview, a reporting software program, by electronically attesting to having personally reviewed the images.  *See id.* at ¶¶ 117, 121.  "When the study is validated in

Clickview both the finalized report and billing information entered by the ultrasound technician are automatically transferred to Epic for billing." *Id.*

**D.     Alleged Fraud**

Plaintiff alleges that "Dr. Silverman routinely does not view study images but applies the attestation as if he had" and subsequently, in conjunction with Upstate OB/GYN, bills government healthcare programs for the studies. *Id.* at ¶¶ 124-25. In support of her allegation, Relator claims that she "and others personally observed Dr. Silverman failing to review test results," that Dr. Silverman has validated imaging studies before the images were uploaded to PACS, "has validated studies in rapid succession (so quickly that image review is impossible)," and "made medical errors best explained by his failure to utilize imaging studies." *Id.* at ¶¶ 126, 194. "Dr. Silverman's failure to review images has [ ] resulted in his failure to identify various serious diagnoses impacting clinical care and patient's lives." *Id.* at ¶ 128. Before images from ultrasound studies are transmitted to PACS, and other viewing systems, the sonographer must press a button on the machine to end the study. *See id.* at ¶ 195. However, Dr. Silverman attested to "viewing ultrasound pictures before the sonographer had ended the study or pressed the button" and therefore when it was not possible for him to have viewed the pictures. *Id.* at ¶ 196. "Lisa Allen, Katie Williams, and Tammy Lohnes, all Upstate sonographers, personally observed 'in progress studies' become validated/attested in the reporting software by Dr. Silverman before they had ended the study or pressed the transmit button" and reported their observations to their superiors, who included Dr. Bernstein. *Id.* at ¶¶ 197, 199.

Relator alleges that "in at least some cases, the missed diagnoses are best explained by a failure to review images making the missed diagnoses one indicator that Dr. Silverman was in fact failing to review images." *Id.* at ¶ 129. One of Dr. Silverman's patients, known as Patient #1,

"had multiple fetal abnormalities" which someone without MFM training could have diagnosed from ultrasound findings as Cornelia de Lange syndrome. *Id.* at ¶ 130. Patient #1 had an ultrasound on March 3, 2016, but Dr. Silverman did not propose or explore any potential diagnoses and told her that "her baby was going to die and that she would require a C-section to remove the fetus." *Id.* at ¶¶ 131-33. Although an attendee at a perinatal pediatrics conference suggested that Patient #1 had Cornelia de Lange syndrome, Dr. Silverman "never used this information . . . for the patient's benefit." *Id.* at ¶ 135. "Based on Dr. Silverman's recommendations, Patient #1 had a completely unnecessary surgical birth and now has a living child with special needs – neither of which she expected." *Id.* at ¶ 138. Patient #1 was insured by, and her ultrasound was billed to, Medicaid. *Id.* at ¶¶ 139-40.

Dr. Silverman also incorrectly diagnosed Patient #2 as having a fetus with gastroschisis, a defect involving abdominal wall muscles. *See id.* at ¶¶ 148-49. However, Patient #2's fetus had a more serious defect known as omphalocele, an abdominal wall defect at the belly button. *See id.* Gastroschisis and omphalocele have different accepted standards of care. *See id.* at ¶ 150. "The two conditions are easily distinguishable because omphalocele is distinctly characterized by the presence of an obvious peritoneal sac which is not present in gastroschisis," and at least eight images that were part of Patient #2's study on August 3, 2018, clearly document omphalocele. *Id.* at ¶ 151. Relator alleges that Dr. Silverman did not review the study images, and therefore missed the important diagnosis which impacted the prenatal care of his patient because she did not receive the indicated genetic counseling and amniocentesis. *See id.* at ¶ 154.

On July 28, 2016, Patient #3 had an anatomy scan done. *See id.* at ¶ 160. "Her images were uploaded for physician viewing at 3:06pm that day but Dr. Silverman validated her imaging

report" and attested to reviewing her images "at 2:21pm[.]"[1]  *Id.*  According to the EMR, Patients #3-18 were also "speed signed" by Dr. Silverman on July 28, 2016.  *Id.* at ¶ 164.  "Based on the timing of the validation and the Ultrasonography workflow described in Section II.A., Dr. Silverman spent less than 1 minute on all but one chart – not enough time to review the associated images."  *Id.* at ¶ 165.  He spent three minutes on Patient #18's chart, but "the complicated nature of Patient #18's case makes 3 minutes similarly impossible and insufficient to meaningfully review the images."  *Id.* at ¶ 166.  Dr. Silverman also told several of his patients that their pregnancies were normal, leading them to continue non-viable pregnancies and suffer dangerous complications which could have been avoided, when images that he attested to reviewing should have indicated that they were not normal.  *See id.* at ¶¶ 142-43.

The Women's Health Services referred Patient #2, Patient #3, and Patient #18 to Dr. Silverman, and nearly all of the patients treated at the Women's Health Services are insured by Medicaid.  *See id.* at ¶¶ 155-56, 161-62, 167, 172.  Relator pleads that, upon information and belief, Patient #2's ultrasound was billed to Medicaid and Patients #3, 18 were insured by Medicaid or a similar government healthcare program.  *See id.* at ¶¶ 159, 163, 167.  "Dr. Silverman applied his attestation to the ultrasound charts for each of these patients meaning the scans were billed."  *Id.* at ¶ 168.  "Over 70% of all patients that obtain imaging studies reviewed by Dr. Silverman are insured by a Government Healthcare Provider," and at least one of Patients #3-18 were insured by the government.  *Id.* at ¶¶ 170-71.

Ms. Allen, an award-winning sonographer at Upstate and 2011 employee of the year, included non-clinical phrases such as "Santa Claus is coming to town" and "please do not

---

[1] The Exhibit supporting this allegation actually shows that Dr. Silverman attested to reviewing the images on August 1, 2016, at 2:21:17 PM, which is several days after the exam was performed on July 28, 2016.  *See* Dkt. No. 74-6 at 1-2.

validate" in her reports.  *Id.* at ¶ 200; *see id.* at ¶ 233.  Dr. Silverman validated the reports which

included the erroneous phrases.  *See id.* at ¶ 201.  Ms. Allen and Relator also observed Dr.

Silverman "attesting to reports that contained impossibly obvious errors," and "Ms. Allen

personally observed Dr. Silverman speed-signing paper NST tracings without unfolding or

looking at the tracings." *Id.* at ¶¶ 203-04.  Consequently, some patients, including at least one of

whom was insured by Medicaid, had "unnecessary invasive procedures and did not learn about

serious birth defects or risks until the time for interventions had passed." *Id.* at ¶¶ 205-06.  Ms.

Allen tried to bring the issue of Dr. Silverman attesting to viewing studies with non-clinical

phrases and speed-signing paper tracings to her supervisors, who included the "Upstate CMO and

compliance departments." *Id.* at ¶ 207.

Because of the automatic billing system described above, the ultrasounds of Patients' #1-

18, to which Dr. Silverman applied his electronic attestation, were "billed to the relevant payor

which in many cases" was a Government Healthcare Program.  *Id.* at ¶ 228.

## E.    Relator's Actions

In her role as the Maternal Fetal Medicine Division Director, Relator heard "complaints

from staff and patients that Dr. Silverman would document and bill for spending time with

patients when he did not." *Id.* at ¶ 229.  Relator "and others also personally observed Dr.

Silverman failing to review the nonstress testing results described above on more than one

occasion" and confirmed Dr. Silverman's failure to review through "routine monthly

multidisciplinary perinatal conferences" organized by Upstate. *Id.* at ¶¶ 230-32.  Those

conferences were designed to function as both morbidity and mortality conferences and as an

opportunity to plan and describe the care needed at delivery for women carrying fetuses with

known anomalies.  *See id.* at ¶¶ 232.  Ms. Allen was responsible for using the Clickview system,

EMR, and her personal knowledge to help select the patients who did not yet have a definitive care plan and who would be discussed at the monthly conference. *See id.* at ¶¶ 233-34.

"During the presentations, Dr. Silverman's peers questioned whether medically appropriate services were offered to patients and what counseling the patients received." *Id.* at ¶ 236. Dr. Silverman "repeatedly made provably false statements about services he putatively provided, and the care elections made by his patients" including by falsely claiming that patients he had cared for had "a normal amniocentesis or declined amniocentesis when the medical records showed no evidence of counseling or completed procedures." *Id.* at ¶¶ 237-38. Relator alleges that the "deficient care corroborates the fals[ity of the] claims because the best explanation for the deficient care is Dr. Silverman's failure to review imaging and NST studies." *Id.* at ¶ 239. "Dr. Silverman canceled at least one of the perinatal conferences" before "he and Upstate functionally ended them" and replaced the ultrasound coordinator tasked with picking the patients to discuss with an administrative assistant. *Id.* at ¶ 393; *see id.* at ¶¶ 394-95.

Relator alleges that she investigated and confirmed the ultrasound and NST fraud and began "to continuously report the" fraudulent behavior to "Upstate and Crouse leadership" and to "encourage[] them to take corrective action." *Id.* at ¶¶ 240-41. In November 2015, Relator reported the clinical care gaps and deficiencies to Dr. Silverman himself, as her supervisor. *See id.* at ¶ 246. "In addition to reporting to Dr. Silverman himself, [Relator] also reported the observed dangerous and fraudulent patient care to numerous institutional leaders, including:"

| Title | Name |
|---|---|
| Upstate University Sr. Assoc. Dean of Academic Affairs | Paula Trief, PhD |
| Upstate University Vice President of Research | David Amberg, PhD |
| Maternal Fetal Medicine Perinatal Center Director, now Interim Department Chair and President of OB/GYN Associates | John Nosovitch, MD |
| Crouse Hospital Director of Risk Management & Corporate Compliance Risk Management | Katie Shepard |
| UUP (union), Vice President for Academics | Rich Veenstra, PhD |

| | |
|---|---|
| Upstate Hospital Chief Quality Officer (2015-2018) and Crouse Hospital physician | Hans Cassignol, MD |
| Crouse Hospital Chief Quality Officer | Mickey Lebowitz, MD |
| Crouse Hospital Medical Staff President | David Landsberg, MD |
| Crouse Hospital Chief Medical Officer (now CEO) | Seth Kronenberg, MD |
| Upstate Hospital Departmental Quality Officer | Maureen Burke, MD |
| Upstate Hospital Chief Medical Officer (2015-17) | Anthony Weiss, MD |
| Upstate Hospital Chief Medical Officer, Chief Quality Officer (2018-present) | Amy Tucker, MD |
| Upstate University President's Chief of Staff | Sergio Garcia |
| Upstate University President | Danielle Laraque-Arena, MD |
| Upstate University Employee Labor Relations Manager | Lisa Tesorio |
| Upstate University School of Medicine Interim Dean (2016-17), now President | Mantosh Dewan, MD |
| Upstate University School of Medicine Dean (2017-2019) | Julio Licinio, MD |
| Upstate University School of Medicine Dean (2019-present) and President of UMASS (committee of department chairs) | Lawrence Chin, MD |
| Upstate University Faculty Council President | Jay Brenner, MD |
| Upstate University Compliance Officer | Darlene Noyes |
| Upstate Hospital Chief Executive Officer | Robert Corona, MD |

*Id.* at ¶ 242.  Relator made many of those reports during in-person meetings or conversations.  *See id.* at ¶ 244.  In October 2015, Relator met with the Senior Associate Dean of Academics at Upstate to raise her concerns about Dr. Silverman.  *See id.* at ¶ 245.  The patient care gaps and deficiencies which Relator reported "included a specific patient's care and study results going unread and unused – the exact factual basis for the false claims raised herein."  *Id.* at ¶ 247. Relator also reported to the Upstate Chief Quality Officer in April 2016, and throughout 2016, 2017 and 2018, that "Dr. Silverman was putting patient safety and welfare at risk in part by failing to review test results he had attested to reviewing."  *Id.* at ¶¶ 248-49.  Relator made the same reports to Upstate Chief Quality Officer and his counterpart at Crouse, as well as the Upstate Chief Medical Officer and Interim Dean.  *See id.*

In August of 2016, after Relator discovered that "Dr. Silverman had missed an obvious and serious diagnosis" of Cornelia de Lange Syndrome she "advocated to the Crouse Chief Quality Officer that a root cause analysis be undertaken to examine Dr. Silverman's inappropriate care[.]"  *Id.* at ¶ 261.  Another person anonymously reported that Dr. Silverman "missed" the Cornelia de Lange Syndrome diagnosis for Patient #1, whose care was paid for by the government.  *See id.* at ¶¶ 262, 267.  Relator alleges that "[a]ny trained Maternal Fetal Medicine doctor would have quickly made the diagnosis upon viewing the ultrasound images" and that Dr. Silverman missed the diagnosis "because he failed to view the images or complete the examination."  *Id.* at ¶¶ 264-65.  Dr. Silverman also deviated from the "standard of care in Maternal Fetal Medicine" by failing to "document the search for syndromes and the databases consulted."  *Id.* at ¶ 266.  An outside review confirmed that the care Dr. Silverman provided was suboptimal" and afterwards Relator was "tasked with formulating and implementing departmental process improvements to prevent a recurrence."  *Id.* at ¶ 268.

**F.      Retaliation**

"During a December 2, 2016, meeting with Dr. Mantosh Dewan, the Interim Dean of the School of Medicine, Dr. Bernstein provided a typed outline of her concerns" which she also emailed to Dr. Veenstra, Vice President of Academics, and Dr. Dewan, Interim Dean of the School of Medicine. *Id.* at ¶¶ 250-51. In the outline of her concerns, Relator included the allegation that Dr. Silverman repeatedly "engaged in retaliation against those questioning his decision making" and "continues to incompletely assess and manage patients." *Id.* at ¶¶ 250, 252. The email with her complaints was "later forwarded to Lisa Tesorio, the Upstate University Employee Labor Relations Manager." *Id.* at ¶ 253.

In June 2017, Relator "emailed Dr. Danielle Laraque-Arena, the Upstate University President, and Sergio Garcia, Chief of Staff, to discuss in part 'ongoing unaddressed quality and accountability issues influencing the well being of patients entrusting their care to our department.'" Dkt. No. 74-12 at 1-2. In May of 017, Relator reported her concerns about Dr. Silverman's billing activities to the Upstate Vice President of Human Resources. *See* Dkt. No. 74 at ¶ 280.

In May and September of 2017, shortly after she had reported her concerns to Dr. Veenstra and Dr. Laraque-Arena, Dr. Silverman allegedly "abused his leadership and administrative positions to institute sham peer review cases" against Relator at Crouse Hospital. *See id.* at ¶ 275. Although she states that her care was "confirmed as being appropriate in all cases," Relator alleges that the peer review cases were an act of retaliation against her. *See id.* at ¶¶ 276-77. In early summer 2017, Relator started advocating for a full external review of the billing practice Upstate Hospital, University OB/GYN, and Crouse Hospital. *See id.* at ¶ 281.

In February 2018, Relator emailed Dr. Licinio, the then Dean of the School of Medicine,

and Dr. Brenner, Upstate University Faculty Council President, and informed them that she had "received numerous credible complaints that Dr. Silverman has billed for E/M services not rendered." Dkt. No. 74-13 at 1. Dr. Licinio suggested Relator speak with a different person in leadership at Upstate. *See* Dkt. No. 74 at ¶ 256. By February 21, 2019, Relator's concerns about the alleged fraudulent billing were "circulated on emails among Upstate's CEO, President (formally Interim Dean), and Chief Medical Officer and Chief Quality Officer." *Id.* at ¶ 257. The "institutional leaders acknowledged [Relator's] concerns and claimed they were committed to finding a resolution, but no resolution ever materialized." *Id.* at ¶ 258.

On March 6, 2019, Relator emailed Dr. Corona, the Upstate CEO, to inform him of the alleged billing fraud and her attempts to bring the fraud to supervisors' awareness. *See id.* at ¶ 259.

Relator alleges that she was increasingly retaliated against as she continued to "raise patient safety and fraudulent billing concerns[.]" *Id.* at ¶ 260. On November 15, 2016, Relator told the Upstate Chief Medical Officer that she was concerned Dr. Silverman would retaliate against her if she implemented changes pursuant to the review and that Dr. Silverman had already sent her a letter threatening to reduce her compensation. *See id.* at ¶¶ 269-70. Relator "was assured that Dr. Silverman would be completely supportive of the process improvement project." *Id.* at ¶ 271. Dr. Silverman also repeatedly, unilaterally reduced Relator's compensation from the summer of 2017 through 2018, which coincides with the time Relator was reporting his behavior to supervisors. *See id.* at ¶ 278. University OB/GYN was responsible for at least some of the reductions in compensation. *See id.* at ¶ 279.

In April 2019, Upstate approved an independent review provided by The Society for Maternal Fetal Medicine ("SMFM"), and that review was completed in February 2020. *See id.* at

¶¶ 282-284.  Upstate and University OB/GYN imposed several conditions which Relator alleges were "designed to limit the effectiveness of the review" including "forbid[ding] SMFM and Relator from interacting[.]"  *Id.* at ¶¶ 284-85, 288.  Upstate has not "made the final report available to anyone outside senior leadership."  *Id.* at ¶ 286.  Dr. Silverman "announced he would retire from Upstate Medical University and relinquish his position as Department Chair" within one business day of SMFM finishing its site work, although he returned to his practice at Upstate and Crouse around January 2021.  *Id.* at ¶ 287.  Relator "is informed that upon his return, Dr. Silverman continued his earlier practice of attesting to completing patient care he did not in fact complete" and for which the Entity Defendants then billed.  *Id.* at ¶ 289.

"Around the time Upstate agreed to the SMFM practice review, Dr. Silverman moved the department's morbidity and mortality records," that showed unusually high maternal morbidity and mortality rates, "off of Upstate's computer system" where they had been stored for twenty-to-thirty years, "and placed them on a Crouse system."  *Id.* at ¶ 398; *see id.* at ¶¶ 396-97.

Relator alleges that each Defendant was "directly or indirectly" aware that she "was reporting, attempting to remedy, or refusing to participate in dangerous patient care and one or more false claims."  *Id.* at ¶ 290.  Relator alleges that, in the fall of 2015, Dr. Silverman learned of the complaints she made alleging that he was submitting false claims.  *See id.* at ¶ 292.  University OB/GYN also learned of Relator's reports at that time, as well as the reports Relator made directly to Dr. Silverman because Dr. Silverman was acting as President of University OB/GYN at the time.  *See id.* at ¶ 293.  Dr. Silverman likewise informed the other Entity Defendants of the complaints against him.  *See id.* at ¶ 295.

The leaders at Upstate to whom Relator reported her concerns were also "charged with oversight" of University OB/GYN.  *Id.* at ¶ 296.  The amended complaint alleges that all relevant

leaders at Upstate, University OB/GYN, and Crouse "were made aware of Dr. Silverman's frauds." *Id.* at ¶ 297.  However, even though Upstate's policy explicitly states that billing for work that has not been performed is fraud and the Centers for Medicare and Medicaid Services regularly issue similar warnings, none of the Entity Defendants took action to correct Dr. Silverman's alleged fraud or to prevent additional harm. *See id.* at ¶¶ 298-99.

Relator alleges that Dr. Silverman and the Entity Defendants "took steps to insulate" Dr. Silverman and themselves from scrutiny, including by harassing Relator, taking away some of her titles and compensation, instigating "sham peer review investigations," and attempting to hide evidence of wrongdoing. *Id.* at ¶ 301; *see id.* at ¶ 300.  Defendants "attempt[ed] to silence" her when they engaged in a campaign of harassment against her, negatively changed her working conditions, withheld her salary, and abused the peer review and credentialing system. *Id.* at ¶ 359.

Relator alleges that Dr. Silverman retaliated against her for making her complaints by harassing her in his capacities as her "clinical colleague, direct supervisor, Clinical Department Chair at Crouse and Upstate, and as President of [University] OB/GYN [ ] which controlled the majority of Relator's compensation." *Id.* at ¶ 343.  Two weeks after Relator implemented departmental process improvements to prevent recurrence of Dr. Silverman's allegedly fraudulent billing activities, Dr. Silverman and University OB/GYN removed her as Maternal Fetal Medicine Division Director, a position which came with a $15,000 per year salary increase, and replaced her in that position with Dr. Silverman. *See id.* at ¶¶ 268-72, 345.  "Dr. Silverman continued to attest to completing scans he did not read and continued to harm patients while the Entity Defendants continued to bill for procedures and services that were not completed." *Id.* at ¶ 274.  Relator claims that "Dr. Silverman 'fired' [her] from her Division Director position in

retaliation for her efforts to report, stop, and refuse to participate in Defendants' dangerous patient care and fraudulent billing" and "maintained records about her related to her employment." *Id.* at ¶¶ 320-21.

Relator claims that beginning around December 2015, which was within months of his learning that she had made complaints of his fraudulent billing practices, Dr. Silverman "led the harassment which included sending letters and emails to Relator castigating her for alleged deficiencies in patient care and work effort." *Id.* at ¶ 332. Those "messages were routinely false and filled with inaccuracies" such as the allegations that Relator failed to respond to a patient in distress, failed to properly supervise medical procedures which she then inappropriately billed for, and violated the American College of Graduate Medical Education's billing requirements, which Dr. Silverman had misstated to Relator. *Id.* at ¶¶ 333-36.

"Dr. Silverman also began demanding that Relator work hours in excess of her clinical commitment and generally take on extra tasks." *Id.* at ¶ 337. Dr. Silverman threatened to reduce Relator's compensation if she did not work overnight call and other "'workday' tasks" that caused her monthly "clinical contact hours to exceed her proscribed maximum clinical commitment" of 96 hours per month "by over 50 hours per month." *Id.* at ¶ 338. By January 2018, the Vice President of Research at Upstate "sent a letter to Dr. Silverman instructing him to stop attempting to overload Relator's schedule and to instead abide" by the specific clinical hours requirements in Relator's contract. *Id.* at ¶ 339. Contrarily, Dr. Silverman "began accepting and admitting patients directly to Relator's care at Crouse Hospital without consulting Relator and without examining or even interacting with the patients" which exposed Relator to high levels of malpractice risk. *Id.* at ¶ 340; *see id.* at ¶ 341. Dr. Silverman "also refused to permit Relator to attend various standard conferences and professional development events." *Id.* at ¶ 342.

Relator's terms of employment provided for "payment of 25-75% of the Association of American Medical Colleges average compensation for Maternal Fetal Medicine attending physicians working the same percent clinical effort" after her first year, but she never received the adjustment to average compensation.  *Id.* at ¶¶ 347-48.  Relator claims that the failure to increase her salary deprived her of "more than $1 million of compensation."  *Id.* at ¶ 348.  Relator also alleges that she was deprived of compensation because "Dr. Silverman and OB/GYN Associates intentionally and repeatedly miscalculated" the percentage of time she spent on clinical work, causing her time to erroneously fall below her contractually committed clinical productivity requirements.  *Id.* at ¶ 351; *see id.* at ¶¶ 350, 352.  Relator was not compensated for Family and Medical Leave Act ("FMLA") time off that she took in September 2017, even though she was entitled to compensation "for most of the time she was on leave" and withheld her compensation for several days after she returned.  *Id.* at ¶ 354; *see id.* at ¶¶ 353, 355.  "[O]n May 31, 2018, Relator was constructively discharged from her clinical duties" and Defendants have "cancelled her malpractice insurance coverage" and "refused to pay her since that date[.]"  *Id.* at ¶¶ 356-57.

Dr. Silverman made "false allegations to the Crouse peer review system that Relator had engaged in deficient patient care" such as when he "made-up test results and then alleged Relator's care was deficient in light of the fake test results."  *Id.* at ¶¶ 360, 362.  Relator claims that, by making false reports, Dr. Silverman enlisted Upstate and Crouse in his attempts to hide Defendants' misconduct and to retaliate against Relator.  *See id.* at ¶ 366.  After the allegations against Relator had been cleared, Dr. Silverman nevertheless reported those charges to people working at Upstate, "effectively smearing [Relator's] exemplary clinical record and lessening the impact of [her] voiced concerns regarding Dr. Silverman's ongoing deficient and dangerous clinical care and fraudulent billing practices."  *Id.* at ¶ 367.  Relator claims that Dr. Silverman

intentionally made these "sham reports" to "restrict her access to the EMR and other electronic patient records which could shed further light on Defendants' bad acts" and further retaliate against her for reporting the bad acts. *Id.* at ¶ 368; *see id.* at ¶ 369.

Around the time Relator was discussing her concerns about Dr. Silverman's billing practices with the Upstate Chief Medical Officer, CEO, and Dean, Dr. Silverman began lodging false security reports against her. *See id.* at ¶ 375. "Within weeks of Upstate's April 2019 decision to permit the SMFM practice review" Dr. Silverman retaliated against Relator by making "false reports to Upstate's labor relations department, the Upstate University Police Department, and Crouse's security team" that Relator "had threatened his life" and the life of Mark Gilbert, a member of the administrative staff. *Id.* at ¶¶ 371-72; *see id.* at ¶ 380. In response to the allegations, Upstate "restricted Relator's access to patient care facilities and removed her access to the EMR and incident reporting systems." *Id.* at ¶ 374. Dr. Silverman also "falsely reported to Crouse security that Relator's clinical privileges had been revoked at both Upstate and Crouse hospitals and that she was being investigated by the state medical board" even though her privileges had never been restricted, and Dr. Silverman was aware of that. *Id.* at ¶ 379; *see id.* at ¶ 382. Relator claims that Crouse could have immediately verified the falsity of Dr. Silverman's allegations against her by checking her physician privileges, but instead Crouse restricted her access to Crouse facilities and the EMR. *See id.* at ¶¶ 383-84, 391. Relator was not able to work in the Crouse facilities or earn money at Crouse without access to EMR or the building. *See id.* at ¶¶ 385, 392. Relator alleges that Crouse's participation in restricting her access aided Dr. Silverman's attempts to retaliate against Relator and coverup his own misconduct. *See id.* at ¶ 387. Dr. Silverman also filed a false police report claiming that Relator had threatened his life, although the District Attorney concluded that "nothing actionable had been reported." *Id.* at ¶

389; *see id.* at ¶ 388.

## III. DISCUSSION

**A.      Legal Standards**

*1. Motion to Dismiss*

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief.  *See Patane v.*

*Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted).  In considering the legal

sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all

reasonable inferences in the pleader's favor.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493

F.3d 87, 98 (2d Cir. 2007) (citation omitted).  This presumption of truth, however, does not

extend to legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

Although a court's review of a motion to dismiss is generally limited to the facts presented in the

pleading, the court may consider documents that are "integral" to that pleading, even if they are

neither physically attached to, nor incorporated by reference into, the pleading.  *See Mangiafico v.*

*Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d

147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the

claim," *see* FED. R. CIV. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is

entitled to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted).

Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief

above the speculative level," *see id.* at 555 (citation omitted), and present claims that are

"plausible on [their] face," *id.* at 570.  "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Iqbal*, 556 U.S. at 678 (citation omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'"  *Id.* (quoting [*Twombly*, 550 U.S.] at 557).  Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

### 2. Rule 9(b)

"Because '[i]t is self-evident that the FCA is an anti-fraud statute' and therefore 'claims brought under the FCA fall within the express scope of Rule 9(b),'" *Wood ex rel. United States v. Applied Rsch. Assocs.*, *Inc.*, 328 Fed. Appx. 744, 747 (2d Cir. 2009) (citation omitted), "claims brought pursuant to the FCA are subject to the heightened pleading standard of FED. R. CIV. P. 9(b)." *United States v. Dialysis Clinic, Inc.*, No. 09-CV-0710, 2011 WL 167246, *9 (N.D.N.Y. Jan. 19, 2011) (citations omitted); *see also Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1477 (2d Cir. 1995) ("[C]laims brought under the FCA fall within the express scope of Rule 9(b)"); *United States ex rel. Duhaine v. Apple Health Care Inc.*, No. 3:19-CV-00963, 2022 WL 3226631, *5 (D. Conn. Aug. 10, 2022) ("*Apple Health*") (quoting *United States ex rel. Gelbman v. City of New York*, 790 Fed. Appx. 244, 249 (2d Cir. 2019)) ("Dismissal for failure to satisfy FED. R. CIV. P. 9(b)'s particularity standard is required where FCA claims under Sections 3729(a)(1)(A) and (B) rest on 'speculation and conclusory allegations'").

A plaintiff alleging fraud under Rule 9(b) "must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  FED. R. CIV. P. 9(b).  The allegations of fraud must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and

27

when the statements were made, and (4) explain why the statements were fraudulent." *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 240 (S.D.N.Y. 2012) (internal quotation marks omitted).  A plaintiff-relator alleging fraud under the FCA must allege "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them." *United States ex rel. Chapman v. Off. of Child. & Fam. Servs. of the State of N.Y.*, No. 1:04-CV-1505, 2010 WL 610730, *4 (N.D.N.Y. Feb. 16, 2010) (internal quotation marks omitted).

"Despite the rigid Rule 9(b) pleading requirements, allegations may be based on 'information and belief when facts are peculiarly within the opposing party's knowledge.'" *United States v. Amedisys, Inc.*, No. 17-CV-136, 2023 WL 2481144, *3 (W.D.N.Y. Mar. 13, 2023) (quoting *United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81-82 (2d Cir. 2017)) (citation omitted).  "'Where pleading is permitted on information and belief' in a complaint that alleges fraud (and is therefore subject to Rule 9(b)), we require that the complaint 'adduce specific facts supporting a strong inference of fraud.'" *Chorches*, 865 F.3d at 82 (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)).

However, courts "'must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations'"; rather, "'plaintiffs must allege facts that give rise to a strong inference of fraudulent intent.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52, (2d Cir. 1995)).  "An inference is 'strong' if it is cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Pilkington N. Am. Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 460 F. Supp. 3d 481, 492 (S.D.N.Y. 2020) (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 176-77 (2d Cir. 2015)).

### 3. False Claims Acts

The False Claims Act is a federal law that prohibits the submission of false or fraudulent claims for payment to the federal government.  "The FCA imposes liability for, among other things, 'knowingly' presenting or causing to be presented, a false or fraudulent claim 'for payment or approval.'"  *United States v. Northern Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 286 (E.D.N.Y. 2016) (quoting 31 U.S.C. § 3729[a]).

"Under the FCA, a 'claim' includes 'direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs.'"  *Conte v. Kingston NH Operations LLC*, 585 F. Supp. 3d 218, 233 (N.D.N.Y. 2022) (quoting *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 182 (2016)).  "Private persons, known as relators, may file *qui tam* actions—actions on behalf of the government—for violations of § 3729."  *United States v. Empire Educ. Corp.*, 959 F. Supp. 2d 248, 253 (N.D.N.Y. 2013) (citing 31 U.S.C. § 3730(c)(3); *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16 (2d Cir. 1990)).  "Should a relator file such an action under either the FCA or NYFCA, the federal or state government may elect to proceed and intervene in the action, or they may decline to do so."  *Conte*, 585 F. Supp. 3d at 233 (citing 31 U.S.C. § 3730(b)-(c); N.Y. Fin. Law § 190(2)(b)).

In relevant part, the FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" by the United States government, 31 U.S.C. § 3729(a)(1)(A), "knowingly makes, uses, or causes to be made or used, a false record or statement material to [such] a false or fraudulent claim," *id.* § 3729(a)(1)(B), or "conspires to commit [such a] violation."  *Id.* § 3729(a)(1)(C).  "The prototypical case under section 3729(a)(1)(A) is known as a 'presentment' action."  *United States ex rel. Scott v. Pac.*

*Architects & Engineers (PAE), Inc.*, 270 F. Supp. 3d 146, 153 (D.D.C. 2017) (quoting *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 87 (D.D.C. 2014)).  The elements of a presentment claim are that "(1) the defendant submitted or caused to be submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false." *United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 117 (D.D.C. 2014).  "To prove knowledge, it must be established that an FCA defendant had actual knowledge or acted in deliberate ignorance or reckless disregard of the truth or falsity of the information." *Homeland Ins. Co. of Delaware v. Indep. Health Ass'n, Inc.*, No. 22-CV-462S, 2023 WL 5214697, *3 (W.D.N.Y. Aug. 15, 2023) (quoting 31 U.S.C. § 3729(b)(1)(A)).

"[T]he elements for a count brought under section 3729(a)(1)(B) are practically identical to the requirements for a count brought under section 3729(a)(1)(A)." *Pencheng*, 71 F. Supp. 3d at 87 (citation omitted).  "The only notable difference is that, as the language suggests, section 3729(a)(1)(B) requires evidence that the defendant made a false statement to the government, as opposed to the submission of a false claim for payment." *Id.* (comparing 31 U.S.C. § 3729(a)(1)(B) with § 3729(a)(1)(A)).

The NYFCA is "nearly identical to the [federal] FCA in all material respects." *United States ex rel. Assocs. Against Outlier Fraud v. Huron Consulting Grp., Inc.*, 929 F. Supp. 2d 245, 256 (S.D.N.Y. 2013).  "The NYFCA imposes liability for 'knowingly mak[ing] a false statement or knowingly fil[ing] a false record.'" *Conte*, 585 F. Supp. 3d at 233-34 (quoting *People ex rel. Schneiderman v. Sprint Nextel Corp.*, 26 N.Y.3d 98, 112 (2015)).  "When interpreting the NYFCA, New York courts rely on federal FCA precedent." *Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 381 (S.D.N.Y. 2015).

> To prove a false claim under FCA sections 3729(a)(1)(A) and
> 3729(a)(1)(B) or NYFCA sections 189(1)(a) and 189(1)(b), a
> relator must show that the defendant "(1) made a claim, (2) to the [ ]
> government, (3) that is false or fraudulent, (4) knowing of its
> falsity, and (5) seeking payment from the federal treasury."

*United States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 287 (E.D.N.Y. 2016)

(quoting *Bishop v. Wells Fargo & Co.*, 823 F.3d 35, 43 (2d Cir. 2016)).  Under subsection (1)(b)

of the NYFCA, a plaintiff must allege both "'(i) a false record or statement, and (ii) a false claim'

for payment made to the Government."  *United States v. Icahn Sch. of Med. at Mount Sinai*, No.

12-CV-5089, 2015 WL 5472933, *4 (S.D.N.Y. Sept. 16, 2015) (quoting *United States ex rel.*

*Feldman v. City of New York*, 808 F. Supp. 2d 641, 655-56 (S.D.N.Y. 2011)).

Subsection (a)(3) of the FCA imposed liability on "any person who . . . conspires to

commit a violation" of any of the other subsections of § 3729(a).  Similarly, subsection (a)(1)(C)

of the FCA imposes liability on any person who conspires to commit a violation of the other

subsections of § 3729(a)(1).  "To state a claim under this subsection, a relator must show that: '(1)

the defendant conspired with one or more persons to get a false or fraudulent claim allowed or

paid by the United States' and '(2) one or more conspirators performed any act to effect the object

of the conspiracy.'"  *United States ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 825

(S.D.N.Y. 2017) (quoting *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 331

(S.D.N.Y. 2004)).  Courts apply the same analysis to claims for conspiring to violate the NYFCA

section 189(a)(c).  *See State v. MedImmune, Inc.*, 342 F. Supp. 3d 544, 551 (S.D.N.Y. 2018).

Both the FCA and NYFCA protect employees, contractors, and agents from retaliation.

*See* 31 U.S.C. § 3730(h)(1); N.Y. Fin. Law § 191(3).  The FCA's anti-retaliation provision

provides in relevant part that

> [a]ny employee . . . shall be entitled to all relief necessary to make
> that employee . . . whole, if that employee . . . is discharged,
> demoted, suspended, threatened, harassed, or in any other manner
> discriminated against in the terms and conditions of employment
> because of lawful acts done by the employee . . . in furtherance of
> an action under this section or other efforts to stop 1 or more
> violations of [the FCA].

31 U.S.C. § 3730(h)(1).

The NYFCA "defines retaliation as being 'discharged, demoted, suspended, threatened,

harassed or in any other manner discriminated against in the terms and conditions of employment,

or otherwise harmed or penalized . . . because of' protected activity." *New York ex rel. Khurana v.*

*Spherion Corp.*, 511 F. Supp. 3d 455, 477 (S.D.N.Y. 2021) (quoting N.Y. Fin. Law § 191(1)).  To

prevail on a retaliation claim under the NYFCA a plaintiff "must prove, by a preponderance of the

evidence, three elements: (1) that [s]he engaged in activity protected by the statutes; (2) that [the

defendant] knew of that activity; and (3) that [the defendant] retaliated against [her] because of

that conduct." *Id.* (citations omitted).  "Because 'the NYFCA follows the federal False Claims

Act,' New York courts 'look toward federal law when interpreting the New York Act.'" *Hennrick*

*v. MIR Scientific*, LLC., No. 21-CV-4945, 2021 WL 6052118, *3 (S.D.N.Y. Dec. 21, 2021)

(quoting *State ex rel. Seiden v. Utica First Ins.*, 943 N.Y.S.2d 36, 39 (1st Dep't 2012)).

FCA-based retaliation claims are not subject to the more stringent pleading requirements

of Rule 9(b).  *See Chorches*, 865 F.3d at 95 ("The particularity requirement of Rule 9(b) does not

apply to retaliation claims under the FCA" (citations omitted)).  Instead, a plaintiff "is required to

show a 'good faith basis,' or 'objectively reasonable basis,' for believing that he or she was

investigating matters in support of a viable FCA case." *Swanson v. Battery Park City Auth.*, No.

15-CV-6938, 2016 WL 3198309, *3 (S.D.N.Y. June 8, 2016) (quoting *United States ex rel.*

32

*Sasaki v. New York Univ. Med. Ctr.*, No. 05-CV-6163, 2012 WL 220219, *12 (S.D.N.Y. Jan. 25, 2012)).

### 4. New York Labor Law §§ 740 and 741

"[T]o state a claim under [New York Labor Law] section 741 a plaintiff must [ ] plausibly allege a good faith, reasonable belief that the employer's actions actually created a substantial and specific danger to public health or safety or a significant threat to the health of a specific patient." *Underwood v. Roswell Park Cancer Inst.*, No. 15-CV-684, 2017 WL 131740, *19 (W.D.N.Y. Jan. 13, 2017). However, a section 741 "complaint need not specify the actual law, rule or regulation violated, although it must identify the particular activities, policies or practices in which the employer allegedly engaged, so that the complaint provides the employer with notice of the alleged conduct." *Von Maack v. Wyckoff Heights Med. Ctr.*, 140 A.D. 3d 1055, 1057 (2d Dep't 2016) (citations omitted).

Unlike section 740 claims, "[c]laims brought under section 741 . . . are subject to a two-year statute of limitations." *Zhou v. Roswell Park Cancer Inst. Corp.*, No. 19-CV-1200, 2021 WL 4272286, *3 (W.D.N.Y. Sept. 21, 2021); *see also Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 132 (2d Cir. 2007) ("[T]he limitations period applicable to a claim brought under section 741 is two years.") (citing N.Y. Lab. Law § 740(4)(d)). Section 741 affords a health care "employee," as defined in the statute, a cause of action against the employer for "retaliatory action" taken because the employee does any of the following:

> (a) discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or

> (b) objects to, or refuses to participate in any activity, policy or
> practice of the employer or agent that the employee, in good faith,
> reasonably believes constitutes improper quality of patient care.

N.Y. Lab. Law § 741(2)(a)-(b); *see also Reddington v. Staten Island Univ. Hosp.*, 543 F.3d 91, 93-94 (2d Cir. 2008) (holding that section 741 applies to "employees who actually supply health care services," but not those who "merely coordinate with those who do") (quoting *Reddington v. Staten Island Univ. Hosp.*, 11 N.Y.3d 80, 91 (2008)).  "The Health Care Whistleblower Law contemplates enforcement through the private right of action established in New York's general Whistleblower Law, Labor Law § 740."  *Sokolovsky v. Silver Lake Specialized Care Ctr.*, No. 21-CV-01598, 2023 WL 5977298, *13 (E.D.N.Y. Sept. 14, 2023) (citing *Reddington*, 11 N.Y.3d at 88).

Section 740 of the New York Labor Law – New York's Whistleblower Act – prohibits employers from taking retaliatory personnel action against an employee based on the employee's disclosure of certain employer violations of laws, rules, or regulations.  *See* N.Y. Lab. Law § 740(2).  The statute provides an enforcement mechanism in the form of a civil action for certain damages and injunctive relief.  *See id.* § 740(4)-(5).  New York's Whistleblower Act provides in relevant part that

> [a]n employer shall not take any retaliatory personnel action against
> an employee because such employee . . . discloses, or threatens to
> disclose to a supervisor or to a public body an activity, policy or
> practice of the employer that is in violation of law, rule or
> regulation which violation creates and presents a substantial and
> specific danger to the public health or safety.

N.Y. Lab. Law § 740(2).  Thus, in order to state a cause of action for retaliation under section 740,

> a plaintiff must allege facts supporting the conclusion that (1) he
> was subject to a retaliatory personnel action after (2) disclosing to a

> supervisor [or public body] (3) a practice of the employer that is in
> violation of a law, rule, or regulation (4) that creates and presents a
> substantial and specific danger to the public health or safety.

*Clarke v. TRW, Inc.*, 921 F. Supp. 927, 933 (N.D.N.Y. 1996).

## B.    Presenting or Causing a False Claim

Defendants move to dismiss the claims for Presenting or Causing a False Claim in

violation of the section 3729(a)(1)(A) of the FCA and section 189(1)(a) of the NYFCA for failure

to state a claim pursuant to Rule 12(b)(6) and for failure to allege fraud with particularity pursuant

to Rule 9(b).

Crouse argues that: (1) Relator makes only boilerplate allegations that the government

refuses to pay for services which are not actually used in treating patients, and therefore has not

pleaded materiality; (2) Relator has not pleaded that Crouse acted knowingly; (3) the amended

complaint fails to plead fraud with particularity as required by Rule 9(b) because it fails to

identify any specific claims for payments of funds; (4) the amended complaint does not identify

any fraudulent claim submitted by Crouse and lumps all Entity Defendants together; and (5) the

FCA and NYFCA claims fail as a matter of law because Crouse could not have submitted a false

claim for the technical fee.  *See* Dkt. No. 84-1.

University OB/GYN argues that: (1) for the same reasons as argued by Crouse, Relator

has not pleaded materiality; (2) relator has not pleaded that University OB/GYN knew or should

have known that Dr. Silverman was failing to review test results; (3) Relator failed to plead

sufficient detail around the allegedly false claims for fetal NSTs; (4) Relator's theory of false

claims for ultrasonography is better explained by negligence and medical misdiagnosis than that

Dr. Silverman did not view the images; and (5) Relator does not specify Defendants' different

roles in causing false claims to be filed.  *See* Dkt. No. 83-1.

Dr. Silverman argues that: (1) Relator has not alleged more than boilerplate allegations of materiality; (2) the amended complaint fails to plead fraud with particularity as required by Rule 9(b) because it fails to identify the dates, amounts of the claim, the individual making or submitting the claims, which false claims were submitted at which location, or any other specific details of the alleged fraudulent claims; and (3) the two examples of misdiagnosis are not connected to allegations of fraudulent billing and falsely equate misdiagnosis with failure to review a study.  *See* Dkt. No. 86-2.

Relator responds that: (1) she has stated a valid claim based on false attestations for both NSTs and ultrasounds; (2) her amended complaint pleads factual details sufficient to satisfy Rule 9(b); and (3) she has adequately alleged that all Defendants had knowledge of Dr. Silverman's fraudulent activity and that the omission is expressly unlawful and would have affected the government's payment decision and is therefore material.  *See* Dkt. No. 88.

### 1. Materiality

To be actionable under the FCA, "[a] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision." *Universal Health Servs., Inc. v. United States ex rel Escobar*, 579 U.S. 176, 181 (2016).  The FCA defines materiality as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  In *Universal Health Servs., Inc. v. United States ex rel Escobar* ("*Escobar*"), the Supreme Court established the materiality pleading requirement for false claims.  *See United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 104 (2d Cir. 2021).  In *Escobar*, the plaintiffs filed a *qui tam* suit asserting claims under the FCA and seeking "to hold the defendant liable under an implied false certification theory of liability."  *Id.* (quoting *Escobar*, 579 U.S. at 180-81).  The Supreme Court held that "[a]

misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Escobar*, 579 U.S. at 181.  Accordingly, "a misrepresentation is not necessarily material because 'the Government would have the option to decline to pay if it knew of the defendant's noncompliance.'" *United States v. Strock*, 982 F.3d 51, 59 (2d Cir. 2020) (quoting *Escobar*, 579 U.S. 194).  *Escobar* established that, when determining materiality, courts inquire into whether the "noncompliance is minor or insubstantial." *Escobar*, 579 U.S. at 194.  The Supreme Court further established that:

> [P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement.  Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.  Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 195.

Defendants each argue that *Escobar* requires resolving the question of whether the alleged fraudulent attestations were "material to the Government's payment decision" in their favor. Defendants contend that Relator's amended complaint "only contains a boilerplate allegation about materiality[.]"  Dkt. No. 84-1 at 19; *see also* Dkt. No. 83 at 19 (University OB/GYN incorporating by reference Crouse's arguments with respect to materiality); Dkt. No. 86-2 at 19-20 (Dr. Silverman referencing Crouse's arguments with respect to Relator's "boilerplate materiality allegations").

"The first factor that *Escobar* identifies as relevant to materiality is whether the government 'expressly identif[ied] a provision as a condition of payment.'" *Strock*, 982 F.3d at 62 (quoting *Escobar*, 579 U.S. at 194). Relator argues that this factor weighs in favor of materiality because billing for services not rendered is expressly unlawful under the relevant healthcare regulations. *See* Dkt. No. 88 at 25.

Crouse argues that it only bills for a technical fee which reimburses the hospital for its work and does not include the physician's interpretation of studies, and that Relator has not alleged how Dr. Silverman's alleged failure to interpret fetal NST results is material to the government payor's decision to pay the technical fee. *See* Dkt. No. 84-1 at 20; Dkt. No. 91 at 8.

In opposition, Relator argues that whether Dr. Silverman truthfully attested to reviewing test results is material to whether the government payors would have paid Crouse because "Government Healthcare Programs do not knowingly or purposely pay facility charges (or any charges) for tests that are not completed, used, and do not contribute to patient care" and the ultrasounds and fetal NSTs at issue here were "unfurnished medical care" of the type which she has alleged federal and state government payors do not pay for. Dkt. No. 88 at 25, 26. The amended complaint pleads that Medicare, Medicaid, and the state analogues, only pay for "medically necessary" care, services, and equipment, and that "Providers must assure that the services they provide are medically necessary and appropriate." Dkt. No. 74 at ¶ 82 (citing 42 U.S.C. § 1320c-5(a)(3)); *see also id.* at ¶¶ 80-91. The amended complaint further alleges that "[t]he government regularly refuses to pay for medical services not actually used for the treatment or diagnosis of medical conditions or infirmities and when providers bill for and receive payment for such services, the government regularly pursues recovery of those payments through FCA lawsuits or otherwise." *Id.* at ¶ 95. The amended complaint also claims that "whether or not a

service is reasonable and necessary" and therefore "material to the government's payment decision regardless of whether the claims being billed" is the same "for a personally performed physician service or a related technical or facility fee." *Id.* at ¶ 96.

Relator has cited several cases, which Defendants do not dispute the applicability of in response, supporting the contention that the utility of a medical test is material to whether the government would pay for that test. *See* Dkt. No. 88 at 27-28. Most demonstrably, in *United States v. Palin*, the defendants owned a medical lab that processed tests ordered by doctors. *See United States v. Palin*, 874 F.3d 418, 421 (4th Cir. 2017). The *Palin* defendants performed more expensive tests on insured patients despite knowing that "the additional tests were unnecessary" for the patients' medical treatment. *Id.* In *Palin*, the Fourth Circuit held that the district court's omission of the materiality element of the claim against the defendants was harmless because the record conclusively established that insurers would not have paid for the more expensive tests "had they known those tests were not medically necessary." *Id.* at 422. Here, Relator has similarly alleged that government payors would not have paid for tests which were not medically necessary. *See* Dkt. No. 88 at 26-29.

The Court therefore finds that the first materiality factor weighs in Relator's favor.

The second materiality factor "concerns the government's response to noncompliance with the relevant contractual, statutory, or regulatory provision." *Strock*, 982 F.3d at 62. Turning first to the government's response to similar noncompliance in other cases, the amended complaint alleges that "the government regularly pursues recovery of [this type of fraudulent] payment through FCA lawsuits or otherwise." Dkt. No. 74 at ¶ 95. Relator points out civil enforcement actions against New York Presbyterian Hospital and Edgewater for engaging in fraudulent billing

for medical testing similar to the kind allegedly perpetrated by Defendants.  *See* Dkt. No. 100 at 2 n.2.

Defendants argue that "Relator fails even to identify any false claims or any payors who received them, which means that she cannot articulate how their unidentified payment decisions could have been affected." Dkt. No. 84-1 at 20 (citing *Conte*, 585 F. Supp. 3d 218).  Defendants cite *Conte* as support for the argument that Relator's failure to identify specific claims and the payors who received them means she cannot establish materiality.  *See id.*  In *Conte*, the plaintiff had not plausibly alleged facts suggesting that the defendant's employees submitted any fraudulent or false claims to Medicaid or Medicare.  *See Conte*, 585 F. Supp. 3d at 240.  By contrast, Relator has alleged that "[a]pproximately 70% of bills generated by the Upstate and Crouse Maternal Fetal Medicine practice are directed to one of several Government Healthcare Programs."  Dkt. No. 74 at ¶ 97; *see also id.* at ¶¶ 96, 156, 170-72.  In *Pilat v. Amedisys, Inc.*, the Second Circuit held that alleging that eighty percent of revenue is derived from government funded healthcare was sufficient to "raise a strong inference that false claims were, in fact, submitted to the government[.]"  *Pilat v. Amedisys, Inc.*, No. 23-566, 2024 WL 177990, *4 (2d Cir. Jan. 17, 2024).  Relator has alleged that Patient #3 was referred to Dr. Silverman by the Women's Health Services, whose patients are almost entirely insured by Medicaid, and that Patient #3 had an ultrasound that Dr. Silverman "speed signed" her test results.  *Id.* at ¶¶ 160-65.

Respecting the substantiality *Escobar* factor, Relator argues that "the omission would have affected the government's payment decision" and therefore it was material.  Dkt. No. 88 at 24 (quoting *United States ex rel. Hussain v. CDM Smith, Inc.*, No. 14-CV-9107, 2017 WL 4326523, *8 (S.D.N.Y. Sept. 27, 2017)).  Because none of the Defendants argue that the allegedly fraudulent bills were not substantial, the Court considers that this factor weighs in Relator's favor

### 2. Knowledge

"The False Claims Act (FCA) imposes liability on anyone who 'knowingly' submits a 'false' claim to the Government." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 741 (2023) (quoting 31 U.S.C. § 3729(a)). The FCA sets out a three-part definition of the term "knowingly" that "largely tracks the traditional common-law scienter requirement for claims of fraud:" Actual knowledge, deliberate ignorance, or recklessness will suffice. *Id.* at 749-50 (quoting § 3729(b)(1)(A)).

Crouse argues that the amended complaint fails to sufficiently allege it had actual knowledge or was deliberately ignorant or in reckless disregard of the fact that Dr. Silverman was inadequately reviewing test results. *See* Dkt. No. 84-1 at 20; *see also* Dkt. No. 92 at 11. Crouse points out that the amended complaint alleges that "the patient care details which would reveal the falsity at issue here occurs on the clinical side and away from the billing department – billing department staff would have no way to determine which of the charts they interact with are tainted by the false claims at issue here." Dkt. No. 74 at ¶ 223. Crouse also argues that Relator charges Crouse with Dr. Silverman's knowledge but fails to allege that he was acting within his scope of employment. *See* Dkt. No. 92 at 11.

Relator responds that the amended complaint alleges that Crouse knew about Dr. Silverman's allegedly fraudulent behavior because she reported her allegations "to the Crouse Hospital Director of Risk Management & Corporate Compliance Risk Management, the Crouse Hospital Chief Quality Officer, and the Crouse Hospital Chief Medical Officer (now CEO)." Dkt. No. 88 at 18 (citing Dkt. No. 74 at ¶¶ 242, 248, 249, 281, 291, 295). Therefore, Relator has plausibly alleged that Crouse had "actual knowledge" because it was "aware of" Dr. Silverman's

actions after Relator's reports.  *See Schutte*, 598 U.S. at 751 (holding that "the term 'actual knowledge' refers to whether a person is 'aware of' information").

University OB/GYN similarly argues that the amended complaint fails to allege that it "knew or should have known that Dr. Silverman was allegedly failing to review test results."  Dkt. No. 83-1 at 19.  However, Relator points out that Dr. Silverman was the president of University OB/GYN during the relevant time periods, including when she made complaints to him about his own behavior, *see* Dkt. No. 74 at ¶ 293, and therefore University OB/GYN had knowledge.  *See* Dkt. No. 88 at 18.  Relator also argues that the amended complaint alleges that she informed various people at Upstate – a nonparty entity—about Dr. Silverman's fraud, and that was sufficient to charge University OB/GYN with knowledge because the President of Upstate "provides governance and oversight" over University OB/GYN.  *See* Dkt. No. 88 at 35-36; *see also* Dkt. No. 74 at ¶ 315.  Because she has alleged that Dr. Silverman was the president of University OB/GYN, and that he had both personal knowledge of his own fraudulent behavior as well as that she reported his behavior to him, Relator has plausibly pleaded that University OB/GYN had knowledge of the alleged fraud.

University OB/GYN does not dispute that it had knowledge of Relator's complaints that Dr. Silverman misdiagnosed Patient #1 and Patient #2, but argues that those misdiagnoses do not support the claim that he did not read the patients' ultrasounds and therefore do not support false claims allegations.  *See* Dkt. No. 83-1 at 16.  University OB/GYN argues that "diagnoses can be missed without any malfeasance on the part of the treating physician" and does not necessarily show that he submitted false claims.  Dkt. No. 83-1 at 17.  Dr. Silverman likewise argues that the allegations of his alleged misdiagnoses "sounds in alleged malpractice" rather than evidence of his having submitted false claims.  Dkt. No. 86-2 at 21.  According to University OB/GYN,

Relator's allegations that Dr. Silverman attested to Patient #3's study before it was complete are contrary to the evidence shown in Relator's Exhibit 6.  Dkt. No. 83-1 at 17.   In opposition, Relator argues that whether the misdiagnoses can be attributable to negligence or are necessarily evidence of Dr. Silverman not viewing the test results and therefore of fraud is a question of fact. *See* Dkt. No. 88 at 14.

The Court need not consider whether the Ultrasounds alone would suffice to satisfy the knowledge element of Relator's claim because considering the totality of Relator's allegations, she has adequately alleged that Defendants had knowledge of Dr. Silverman's fraudulent practices.

### 3. Particularity and Specificity

Crouse argues that Relator's claim that Defendants made "'false statements and records material to false or fraudulent claims'" in violation of 31 U.S.C. § 3729(a)(1)(B) and State Fin. Law § 189(1)(b) should be dismissed because she "has not alleged the details of even a single false claim, materiality, or knowledge, [so] there can be no viable false records claim."  Dkt. No. 84-1 at 21 (quoting Dkt. No. 74 at ¶¶ 410-14) (citation omitted).  "University OB/GYN incorporates by reference the argument and supporting case law set forth in Crouse's Memorandum of Law[.]"  Dkt. No. 83-1 at 20.  Relator does not specifically address her 31 U.S.C. § 3729(a)(1)(B) and State Fin. Law § 189(1)(b) claims in opposition.

Crouse argues that Relator has failed to identify any claims that it submitted.  *See* Dkt. No. 84-1 at 13.  First, Crouse contends that the only tests at issue with respect to Crouse are the fetal NSTs because it only bills for services that occur at Crouse and "[n]one of [the alleged] ultrasounds occurred at Crouse or were billed by Crouse, and Relator does not contend otherwise."  *Id.* at 14.

Dr. Silverman argues that Relator does not connect the specific patient examples to allegations of fraudulent billing.  *See* Dkt. No. 93 at 7.  However, this argument is unavailing because Relator alleges that Dr. Silverman did not review the records for at least Patients #1-18 before he attested to them and has alleged that attesting to patient records is a part of billing for the records.  *See* Dkt. No. 74 at ¶¶ 121, 122, 132, 154, 164, 165.

Defendants each argue that Relator does not allege specific fraudulent conduct as to each Defendant and that her failure to specify each Defendants' role in causing false claims to be submitted renders her claim insufficient to meet the applicable pleading standards.  *See* Dkt. No. 83-1 at 17; Dkt. No. 84-1 at 17; Dkt. No. 86-2 at 19.

Defendants each argue that Relator's FCA claims should be dismissed because the amended complaint does not include details identifying particular false claims.  *See* Dkt. No. 86-2 at 17-18; Dkt. No. 84-1 at 13-16; Dkt. No. 83-1 at 14-16.  Crouse and University OB/GYN argue that the amended complaint lacks any specific examples of fetal NSTs that any of the Defendants allegedly fraudulently billed for.  *See* Dkt. No. 84-1 at 13; Dkt. No. 83-1 at 14.  Dr. Silverman argues that Relator has only identified two ultrasounds that he allegedly did not review, and that those allegations are insufficient because his failure to diagnose and misdiagnoses do not establish that he did not view the studies.  Dkt. No. 86-2 at 18 (citing Dkt. No. 74 at ¶¶ 132, 148).

Crouse relies on *United States v. Amedisys, Inc.*, No. 17-CV-136, 2023 WL 2481144 (W.D.N.Y. Mar. 13, 2023) for its argument that "a relator who provides 'zero details identifying particular false claims and instead concludes fraudulent bills must have been submitted'" fails to satisfy the Rule 9(b) pleading requirements.  *Id.* (quoting *Amedisys, Inc.*, 2023 WL 2481144, at *4).  The Second Circuit recently affirmed the *Amedisys* decision on other grounds but disagreed with the district court's finding that the allegations were not sufficiently specific.  *See Pilat*, 2024

44

WL 177990, at \*3.  The Second Circuit noted that, although the allegations were "less detailed than the *Chorches* allegations," the relator had "identified multiple specific instances in which a clinician was instructed either to document patient information falsely to allow for treatments for which the patient did not qualify, or to recommend an unnecessary course of treatment."  *Id.*

Here, Relator has alleged eighteen patients for whom she claims Dr. Silverman attested to viewing their ultrasounds without having reviewed them.  *See* Dkt. No. 74-1; Dkt. No. 74-2; Dkt. No. 74-5.  Specifically, the amended complaint alleges that Patient #1 was insured by Medicaid and had an ultrasound that should have revealed abnormalities, but Dr. Silverman did not notice the abnormalities, and which Dr. Silverman reviewed in under one minute.  *See* Dkt. No. 74 at ¶¶ 130-40, 165.  This weighs in favor of Relator having alleged fraudulent ultrasound claims.

Relator argues that she has "'adduce[d] specific facts supporting a strong inference of fraud'" by alleging that: (1) she and others personally observed Dr. Silverman committing fraud; (2) some of the charts were signed when it was physically impossible for Dr. Silverman to have seen the images; (3) EMR records "demonstrate his attestations were impossible"; (4) Dr. Silverman attested to reviewing records with obviously erroneous statements; and (5) Dr. Silverman improperly counseled patients and missed obvious diagnoses, which is best explained by not viewing the studies.  Dkt. No. 88 at 11 (quoting *Chorches*, 865 F.3d at 82).

Defendants argue that the instant pleadings are distinguishable from those in *Chorches*, where the relator did not identify specific fraudulent invoices but offered specific details about the scheme to falsify records.  *See* Dkt. No. 84-1 at 15; *see also* Dkt. No. 83-1 at 15.  Defendants argue that, in contrast to the relator in *Chorches*, Relator has not pleaded facts from which "systemic falsification" can be inferred because her personal observations are not specific.  *Id.* at 15-16 (citing *United States ex rel. Gelbman v. City of New York*, 790 Fed. Appx. 244, 248-49 (2d

Cir. 2019); *United States ex rel. SW Challenger, LLC v. EviCore Healthcare MSI, LLC*, No. 19-CV-2501, 2021 WL 3620427, *1 (S.D.N.Y. Aug. 13, 2021)).

 Defendants argue that the amended complaint has not identified any fetal NSTs Dr. Silverman attested to before they were reviewed and used for patient care, or which were otherwise fraudulent. *See* Dkt. No. 83-1 at 14; Dkt. No. 84-1 at 13; Dkt. No. 86-2 at 10. In support of this argument, University OB/GYN cites *Gelbman*, where the Second Circuit dismissed the relator's claims for failure to identify any specific claims or to give reasons for not having personal knowledge of the allegedly fraudulent reports submitted to the government. *See* Dkt. No. 83-1 at 15. University OB/GYN also relies on *Apple Health*, where the district court determined that the complaint was deficient because it lacked specific details. *Id.* The court in *Apple Health* found that the complaint needed to contain "at least some of" the following information:

> the date of any such claim, the content of the forms or bills submitted, identification numbers, the amount billed to the Government, the particular services for which the Government was billed, the patients or individuals involved in the billing, or the length of time between the alleged non-reimbursable treatment of Medicare patients and the submission of claims for their care.

*Apple Health*, 2022 WL 3226631, at *5.

 Relator argues that her personal observations of Dr. Silverman "applying fake and false attestations for both ultrasounds and NSTs" are sufficient to identify a fraudulent scheme. Dkt. No. 88 at 12. Relator also argues that she was unable to allege specific NST patient records because "of Crouse's (mostly unsuccessful) efforts to hide its fraud from" her. *Id.* at 14. Crouse and Dr. Silverman argue that Relator's personal observations are not specific enough and that her allegations that she "'personally observed' Dr. Silverman applying electronic attestations to fetal

nonstress tests 'without having logged in to Centricity to view the tracings' does not save her"

because Relator has not specified which patient's records she saw, when she observed the

conduct, or other identifying details.  Dkt. No. 84-1 at 16 (quoting Dkt. No. 74 at ¶¶ 184-86); *see*

*also* Dkt. No. 86-2 at 18.  Dr. Silverman argues that Relator's alleged personal observations

contain only "vague patient examples" and do not specify "when the alleged failure to review

occurred, who performed the tests, the payor, amounts billed, or where the tests were performed."

Dkt. No. 86-2 at 17-18.

   In the absence of particular false claims, a relator can allege facts that support a strong

inference that claims were fraudulently submitted; however, Relator has only vaguely alleged that

she "and others personally observed Dr. Silverman speed-signing, validating, and/or attesting to

ultrasounds and NSTS without viewing the underlying images, reports, or tracings."  Dkt. No. 74

at ¶ 194.  Relator's allegations that three named Upstate sonographers "personally observed 'in

progress studies' become validated/attested in the reporting software by Dr. Silverman before they

had ended the study or pressed the transmit button" lack any details identifying when these

observations occurred, why the sonographers did not independently report the alleged fraud, or

any identifying information about the patients whose records were falsely attested to.  *Id.* at ¶ 197.

Neither has Relator offered any reasons why she and the Upstate sonographers who allegedly

witnessed this behavior do not have any specific patient descriptions, dates, times, or other

identifying details.

   Although plaintiffs in the Second Circuit asserting subsection (a)(1)(A) and (a)(1)(B)

claims must plead the submission of a false claim with a high enough degree of particularity that

defendants can reasonably identify particular false claims for payment that were submitted to the

government, *see Ping Chen ex rel. United States v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282,

301-02 (S.D.N.Y. 2013), "where the alleged fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct." *United States v. Novartis Pharms. Corp.*, No. 13-CV-3700, 2022 WL 4217749, *2 (S.D.N.Y. Sept. 13, 2022) (quoting *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 616 (S.D.N.Y. 2013)) (other citations omitted).  Here, the alleged fraudulent conduct pertained to confidential medical records and Relator has alleged that the "detailed billing information is solely and uniquely within the possession, custody, and control of the Entity Defendants."  Dkt. No. 74 at ¶ 222.  Therefore, although the amended complaint does not allege specific identifying information about patient records for NSTs, the Court finds that it contains sufficient detail about the types of claims Dr. Silverman submitted for Defendants to identify the allegedly false claims.

Dr. Silverman argues that the amended complaint does not allege that he "directly bills for services" at either of the Entity Defendants and therefore is not specific enough to state a claim against him.  Dkt. No. 86-2 at 19.  However, the amended complaint alleges that "Dr. Silverman . . . submit[ted] fraudulent bills to Government Health Care Programs," bragged about his ability to bill, and that physicians and facilities jointly are responsible for billing for physicians' procedures.  Dkt. No. 74 at ¶¶ 302, 169, 112.  Relator has sufficiently alleged that, although Dr. Silverman was not in exclusive control of billing, that he was "knowingly mak[ing], us[ing], or caus[ing] to be made or used," 31 U.S.C. § 3729(a)(1)(B), or "present[ing], or caus[ing] to be presented" the allegedly false bills.  *Id.* at § 3729(a)(1)(A).

Crouse argues that "Relator merely asserts that the results of fetal nonstress tests are captured in the Crouse system, claims that Dr. Silverman did not review these results, and then generally alleges that the 'Defendants' submitted claims for the tests" but does not specify what

Crouse's role was in submitting fraudulent claims.  Dkt. No. 84-1 at 17.  However, the amended complaint alleges that NSTs "performed on inpatients at Crouse are . . . captured electronically by the GE Centricity System" and that "Relator has personally observed Dr. Silverman routinely applying attestations to these electronic reports in Soarian without having logged in to Centricity to view the tracings."  Dkt. No. 74 at ¶¶ 184, 186.  Relator has clearly alleged that Crouse uses the GE Centricity System and that Soarian is a documentation system used at Crouse.  *Id.* at ¶ 186; *see also id.* at ¶ 184.  Because the only allegations concerning the Centricity and Soarian systems are in relation to Crouse and in consecutive paragraphs, it is clear that Relator alleges Dr. Silverman was applying attestations in Crouse systems.  In the succeeding paragraph the amended complaint alleges that "Defendants bill Government Healthcare Providers for these tests and for Dr. Silverman's 'service' of reading and interpreting the tests[.]"  *Id.* at ¶ 187.  Although Relator does not specify which tests she refers to, at this stage the Court construes the ambiguity in Relator's favor and reads the allegation as including the NST tests performed at Crouse and referred to in the proceeding paragraphs.

Dr. Silverman argues that Relator alleges he reviewed the ultrasound images for Patients #3-18 too close in time but has failed to plead what the standard time is to review studies.  *See* Dkt. No. 86-2 at 18.  However, the amended complaint alleges that "Relator has personally observed that Dr. Silverman routinely picks up the paper packets but does not unfurl these outpatient fetal heart rate tracings" and that standard practice is for " Physicians [to] pick up, unfurl, and read the tracings."  Dkt. No. 74 at ¶¶ 182, 180.  The amended complaint also alleges that the "less than 1 minute" Dr. Silverman spent reviewing the charts was "not enough time to review the associated images."  *Id.* at ¶ 165.

The Court agrees with Relator that the amended complaint contains sufficient allegations about Defendants' role in the billing process to allege a strong inference that the allegedly false claims were submitted to government payors. *See* Dkt. No. 88 at 15-16.  The amended complaint alleges that most of Defendants' patients are insured by government providers, including Medicaid, *see* Dkt. No. 74 at ¶¶ 139-40, 155-59, that seventy percent of Defendants' patient population is insured by government providers, *see id.* at ¶¶ 96, 156, 170-72, and that physicians sign an attestation which functions as the claim for payment that Defendants' submit to providers. *See id.* at ¶¶ 210-20, 225.

Accordingly, the Court denies Defendants' motions to dismiss Relator's claims pursuant to 31 U.S.C. § 3729(a)(1)(A) and N.Y. State Fin. Law § 189(1)(a).

### 4. False Record Claims

The Court also finds that Relator has stated viable claims pursuant to section 3729(a)(1)(B).  False record claims are "complementary" to those under section 3729(a)(1)(A), and accordingly, "the elements for a count brought under section 3729(a)(1)(B) are practically identical to the requirements for a count brought under section 3729(a)(1)(A)." *United States ex rel. Hawkins v. ManTech Int'l Corp.*, No. 15-CV-2105, 2020 WL 435490, *5 (D.D.C. Jan. 28, 2020) (quoting *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 501 (D.C. Cir. 2004)).

Crouse and University OB/GYN argue that Relator's false records claims fail because she has not alleged facts which support the allegation that the claims for payment which they submitted to the government were false.  *See* Dkt. No. 83-1 at 20; Dkt. No. 84-1 at 21.  Defendants' arguments are unavailing for the same reasons set forth above in connection with Relator's § 3729(a)(1)(A) claims.  The Court finds that Relator has adequately pleaded "false

records" claims under 31 U.S.C. § 3729(a)(1)(B) and N.Y. State Fin. Law § 189(1)(b). *See*

*Foreman*, 19 F.4th at 118 (applying the same reasoning to the relator's 31 U.S.C. § 3729(a)(1)(B)

claims as applied to his claims under 31 U.S.C. § 3729(a)(1)(A)).

**C.    Reverse False Claims**

A false claim can also be established if relator shows that defendants

> knowingly make[ ], use[ ], or cause[ ] to be made or used, a false
> record or statement material to an obligation to pay or transmit
> money or property to the Government, or knowingly conceal[ ] or
> knowingly and improperly avoid[ ] or decrease[ ] an obligation to
> pay or transmit money or property to the Government[.]

31 U.S.C. § 3729(a)(1)(G).  This is known as a reverse false claim. *See United States v. Mount*

*Sinai Hosp.*, 256 F. Supp. 3d 443, 457 (S.D.N.Y. 2017).  An "obligation" is defined as "an

established duty, whether or not fixed, arising from an express or implied contractual, grantor-

grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or

regulation, or from the retention of any overpayment.'"  31 U.S.C. § 3729(a)(b)(3).

Defendants argue that Relator has failed to allege sufficient facts to show that they

"improperly avoided or decreased an obligation to pay" the government and, as a result, Relator's

reverse false claim is redundant. *See* Dkt. No. 83-1 at 20; Dkt. No. 84-1 at 22; Dkt. No. 86-2 at

20; Dkt. No. 91 at 8-9; Dkt. No. 92 at 12-13; Dkt. No. 93 at 9.  Defendants state that Relator relies

on the same acts to substantiate the allegations that Defendants submitted "a false or fraudulent

claim for payment or approval," created "a false record or statement" and "concealed, avoided, or

decreased an obligation to pay or transmit money to the United States."  Dkt. No. 74 at ¶¶ 55, 475.

Defendants rely on the holding in *Gabelli* that allegations stating a claim under 31 U.S.C. §§

3729(a)(1), (2) cannot also form the basis for a claim under subsection (a)(7).  *Gabelli*, 345 F.

Supp. 2d at 338-39.

In opposition, Relator restates the applicable legal standard and, without citing to any facts in the amended complaint, argues that the amended complaint alleges Defendants had knowledge of the overpayments. *See* Dkt. No. 88 at 21-23.  Courts, however, are "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). The Second Circuit has held that "a reverse false claim cannot turn on the same conduct underlying a traditional false claim." *Foreman*, 19 F.4th at 119.  Relator's assertions that Defendants knew about Dr. Silverman's false claims are not sufficient to allege that Defendants "identified" an overpayment within the meaning of the regulation and impermissibly rely on the same allegations which form the basis of her claim under subsection § 3729(1)(1)(A) and (B). *See Gabelli*, 345 F. Supp. 2d at 338 (holding that the same "allegations [that] state a claim under sections 3729(a)(1) and (2) [now §§ 3729(a)(1)(A) and (B)] . . . cannot also form the basis for a claim under subsection (a)(7) [now § 3729(a)(1)(G) ]").  Courts routinely dismiss reverse false claims when relators assert them as a matter of course even though the underlying facts are identical to a false certification claim. *See e.g., United States v. Mount Sinai Hosp.*, 256 F. Supp. 3d 443, 457-58 (S.D.N.Y. 2017) (dismissing the reverse false claim because it was based on the same allegations stated under a false certification claim); *United States v. Carranza*, No. 1:20-CV-05396, 2023 WL 2414166, *9 (S.D.N.Y. Jan. 14, 2023) (same); *United States ex rel. Behnke v. CVS Caremark Corp.*, No. 14-CV-824, 2020 WL 1953626, *10 (E.D. Pa. Apr. 23, 2020) ("[I]n order to plausibly allege a violation of § 3729(a)(1)(G), a plaintiff cannot merely recast his false statement claim by essentially alleging that the defendant failed to refund the false claims that the government paid").

Because Relator's reverse false claim mirrors her false claim under § 3729(a)(1)(A) and 3729(a)(1)(B), she fails to state a plausible claim under 31 U.S.C. § 3729(a)(1)(G).  *See Foreman*, 19 F.4th at 120.

**D.    Conspiracy**

Defendants argue that Relator's conspiracy claims "seem[] to tack on her conspiracy claims as an afterthought and lacks any facts suggesting any agreement to submit false claims." Dkt. No. 84-1 at 21; Dkt. No. 83-1 at 20; Dkt. No. 86-2 at 21.  Defendants rely on the holding in *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 27 (2d Cir. 2016) dismissing a claim for conspiracy under the FCA because the complaint failed "to identify a specific statement where IMS and ITT agreed to defraud the government."

In opposition, Relator argues that the amended complaint alleges "[m]ultiple connections, examples of cooperation, and overt acts" establishing a conspiracy to "obtain and retain monies from the government[.]"  Dkt. No. 88 at 30.  Relator points out that she has alleged that "Upstate, Crouse, and [University] Ob/GYN jointly control . . . [t]he regional perinatal program" and had contractual connections for compensating and sharing physicians.  *Id.* at 31-32.  Relator's conspiracy claim appears to be coextensive with the allegations that comprise the preceding FCA claims under sections 3729(a)(1)(A) and 3729(a)(1)(B).  *See* Dkt. No. 74 at ¶¶ 444-50.

"The first prong of the test for conspiracy requires the relator to allege that the defendant and the entity who submitted the claim 'agreed to defraud the government.'"  *United States ex rel. McSherry v. SLSCO, L.P.*, No. 18-CV-5981, 2023 WL 6050202, *3 (E.D.N.Y. Sept. 15, 2023) (quoting *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 27 (2d Cir. 2016) (quotation marks omitted)).  Relator has pleaded a business relationship between Defendants and potential mutual financial gain from fraud but has not alleged even a single fact in support of finding that

53

there was an agreement to engage in alleged fraud.  Accordingly, Relator's conspiracy claims are dismissed.

**E.**    **Retaliation**

Relator brings claims against all defendants for retaliation under the FCA, 31 U.S.C. § 3730(h) and the NYFCA, State Fin. Law § 191, which the Court will analyze together.  *See Hennrick*, 2021 WL 6052118, at *3.

### *1. Protected Conduct*

"Courts within this Circuit broadly interpret protected activity to include two types of conduct: '(1) lawful acts done by the employee . . . in furtherance of an action under the FCA, and (2) other efforts to stop one or more violations of the FCA.'"  *Conte*, 585 F. Supp. 3d at 242 (quoting *Swanson v. Battery Park City Auth.*, No. 15-CV-6938, 2016 WL 3198309, *3 (S.D.N.Y. June 8, 2016)).  "Such efforts can include both complaining internally to supervisors about suspected fraudulent practices and refusing to engage in such practices."  *Pilat*, 2024 WL 177990, at *2 (citing *Chorches*, 865 F.3d at 97-98).  In *Chorches*, the Second Circuit noted that there is "at best, a hair's-breadth distinction between complaining internally that a practice is illegal under the FCA and advising a supervisor of one's refusal to engage in that illegal practice" and rejecting "[a]ny line-drawing between the two, so as to qualify one but not the other as protected activity under § 3730(h)."  *Chorches*, 865 F.3d at 97-98.

Relator alleges that, after she discovered Dr. Silverman fraudulently attesting to reviewing tests, she "began to continuously report the facts to Upstate Medical University and Crouse leadership and encouraged them to take corrective action."  Dkt. No. 74 at ¶ 241.  Relator further alleges that she made reports to five different people at Crouse, although she does not detail the substance of those reports.  *See id.* at ¶ 242.

University OB/GYN and Crouse argue that Relator's allegations that she reported fraudulent conduct to them did not contain reports of fraudulent activity under the FCA or NYFCA and therefore do not constitute protected activity under those respective statutes. *See* Dkt. No. 83-1 at 23; Dkt. No. 84-1 at 24. University OB/GYN argues that Relator alleged she made reports "centered in concerns of patient safety and welfare" and that is not sufficient to suggest to Defendants that she was concerned about fraud against the government. Dkt. No. 83-1 at 24; Dkt. No. 92 at 14. Crouse similarly argues that Relator's only specific allegation of what she reported is that she "'advocated to the Crouse Chief Quality Officer that a root cause analysis be undertaken to examine Dr. Silverman's inappropriate care in a particular case after it was discovered that Dr. Silverman had missed an obvious and serious diagnosis of Cornelia de Lange Syndrome." Dkt. No. 84-1 at 24 (quoting Dkt. No. 74 at 24). Crouse argues that Relator's reports expressed "concerns about quality of care, not fraudulent billing by Crouse" and did not suggest "that Relator intended to bring an action under or stop a violation of the FCA by Crouse." Dkt. No. 84-1 at 24; *see also* Dkt. No. 92 at 14-15.

In *Pilat,* the Second Circuit recently reversed the decision to dismiss the relator's retaliation claims for failure to allege facts that support an inference that they engaged in protected conduct. *Pilat*, 2024 WL 177990, at *2. The district court had dismissed the relator's claims because it found that they were "motivated by concerns about the health and safety of their residents, not by financial fraud" and "'concerns' about being unable to keep up with the volume of patients and patients being seen for only a few minutes rather than the time billed do not have anything to do with potential false claims." *Amedisys*, 2023 WL 2481144, at *9. The Second Circuit clarified that, because the complaint had alleged that the quality of patient care was fraudulent, and that the defendant still billed for the services, the complaint "alleged that [the

relator] engaged in protected activity by voicing concerns" about the "quality of patient care" which "is fraud" to his supervisors. *Pilat*, 2024 WL 177990, at *2.

Relator's allegations are similar to those in *Pilat*. Relator has alleged that she expressed concern to her supervisors about Dr. Silverman's practices, which she has also alleged were fraudulent. *See* Dkt. No. 74 at ¶¶ 241-42, 260, 296; Dkt. No. 74-9; Dkt. No. 74-14 at 1.

Crouse argues that the one patient for whom Relator specifically alleges reporting concerns for was a patient at Upstate, not at Crouse. *See id.* (citing Dkt. No. 74 at ¶ 262). However, Relator separately alleges that she reported "the observed dangerous and fraudulent patient care to numerous institutional leaders, including" five doctors at Crouse. Dkt. No. 74 at ¶ 242. Although her only specific allegation about the contents of what she reported was regarding a patient who was not at Crouse, Relator's other allegations satisfy her burden.

Dr. Silverman argues that Relator has failed to allege protected conduct because she has not pleaded the specific content of her conversations and the emails which she sent her supervisors complaining of his conduct did not include specific examples of the fraudulent billing. *See* Dkt. No. 86-2 at 23; Dkt. No. 93 at 10-11. For example, the amended complaint includes an exhibit showing an email Relator sent on February 2, 2019, expressing her concern for "clinical care deficiencies, fraudulent billing and integrity impacting the health and well being of obstetric patients." Dkt. No. 74-14. Dr. Silverman is correct that Relator did not attach specific examples of the alleged fraud to any of the emails which the amended complaint incorporates, however, "[a] plaintiff need not plead an FCA retaliation claim with particularity because no showing of fraud is required." *United States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 297 (E.D.N.Y. 2016) (citations omitted). Therefore, Relator has sufficiently

pleaded that she engaged in protected activity by reporting Dr. Silverman's allegedly fraudulent

actions to Defendants.

### 2. Notice

Defendants each argue that Relator has failed to plead that they had notice or were aware

that she was engaging in protected conduct.

Crouse argues that "Relator's allegations regarding her alleged reports to Crouse are

conclusory and devoid of any detail." Dkt. No. 84-1 at 25. Crouse contends that listing the

names of individuals to whom she complained, without further alleging "information about when,

how, or in what context those reports were made, or what she actually said in those reports, is not

enough." *Id.* Although the emails attached to the amended complaint show that Relator

complained about Dr. Silverman's conduct, Crouse argues that Relator has not alleged that those

complaints were "passed on to Crouse[.]" *Id.* (citing Dkt. No. 74-9; Dkt. No. 74-10; Dkt. No. 74-

11; Dkt. No. 74-12; Dkt. No. 74-13; Dkt. No. 74-14; Dkt. No. 74-15). Crouse contends that

Relator's allegation that "[e]ach Defendant directly or indirectly, was aware that Dr. Bernstein

was reporting, attempting to remedy, or refusing to participate in dangerous patient care and one

or more false claims" is unsupported and insufficient to allege notice. *Id.* (quoting Dkt. No. 74 at

¶ 290).

Relator alleges a complex governing structure as support for her assertion that, because

Upstate, University OB/GYN, and Crouse jointly manage the regional perinatal center and

"control or coordinate the delivery of obstetric care across the two facilities" that any information

given to Upstate is imputed to Entity Defendants. Dkt. No. 88 at 36. Relator has alleged that the

same individuals who managed Upstate also managed University OB/GYN. Relator has plausibly

alleged that the commonality of oversight and high level of control over the regional perinatal

center, extensive financial agreements, and the close relationship between Upstate and Crouse supports an inference that Crouse had notice of Relator's complaints. *See* Dkt. No. 74 at ¶¶ 312-14.

The amended complaint also contains specific allegations that Crouse was aware of Relator's protected activity, including the allegations that: (1) Relator "reported the observed dangerous and fraudulent patient care" to five named individuals at Crouse, Dkt. No. 74 at ¶ 242; (2) "in August of 2016" she "advocated to the Crouse Chief Quality Officer that a root cause analysis be undertaken to examine Dr. Silverman's inappropriate care in a particular case after it was discovered that Dr. Silverman had missed an obvious and serious diagnoses of Cornelia de Lange Syndrome" *id.* at ¶ 261; (3) Dr. Silverman was a representative of each Entity Defendant and therefore his awareness of her complaints is imputed to both Crouse and University OB/GYN, *id.* at ¶¶ 25, 292, 293, 295; and (4) she "made a written complaint about Dr. Silverman to Crouse Hospital." *Id.* at ¶ 391.

Although Relator has not specified if her August 2016 report to the Crouse Chief Quality Officer included concerns about the time Dr. Silverman spent reviewing the patient's records, she has alleged that she complained to "leaders at both Upstate and Crouse beginning in 2015" that Dr. Silverman provided inadequate patient care and falsely attested to work he had not done. *See id.* at ¶ 291. Finally, Relator alleges that Dr. Silverman was "vested with substantial authority and broad responsibility at both OB/GYN and Crouse[.]" Dkt. No. 88 at 36.

Therefore, Relator has sufficiently alleged that Crouse had notice of her protected activity.

University OB/GYN argues that Relator has failed to allege that it had any notice that Relator was engaging in actions to further a *qui tam* action or to stop the alleged violations. *See* Dkt. No. 83-1 at 25. University OB/GYN points out that Relator's allegations that she informed

people at Crouse and Upstate about fraudulent billing do not contain specific allegations about "what facts she told leadership," nor does the amended complaint contain allegations that she made complaints to University OB/GYN. *Id.* University OB/GYN argues that Relator's complaints of "fraudulent billing" to Crouse and Upstate leaders could not have given it notice that she was contemplating reporting University OB/GYN. *See id.* University OB/GYN argues that notice to employees at Upstate cannot be imputed to notice at University OB/GYN. *See* Dkt. No. 91 at 9-10.

In opposition, Relator argues that she made "direct and indirect reports to [University] OB/GYN" and the amended complaint alleges that the "Upstate President and/or CEO 'provides governance and oversight over clinical medicine and the various Medical Services Groups including OB/GYN Associates.'" Dkt. No. 88 at 35-36 (quoting Dkt. No. 74 at ¶ 315). Relator also points out that the amended complaint alleges she reported fraudulent behavior to the President of University OB/GYN. *Id.* at 36. Although Relator predominantly cites to allegations that she informed people at Upstate about alleged fraud, the amended complaint does include an allegation that she "reported the observed dangerous and fraudulent patient care" to "Maternal Fetal medicine Perinatal Center Director, now Interim Department Chair and President of OB/GYN Associates" "John Nosovitch, MD[.]" Dkt. No. 74 at ¶ 242. The amended complaint also alleges that "[u]ntil May 31, 2020, Dr. Silverman was the President of OB/GYN Associates" *id.* at ¶ 37, and that in 2015 she expressed concern that he was engaging in fraud to him, thus giving him notice. *See id.* at ¶ 246.

The amended complaint further alleges that "the very same Upstate leaders to whom Dr. Bernstein reported her concerns about dangerous patient care, false claims, and fraud, were charged with oversight of OB/GYN Associates." *Id.* at ¶ 296. According to the amended

complaint, "Upstate's Governing Board, through the President and/or CEO of Upstate and [the Upstate University Medical Associates at Syracuse] provides governance and oversight over clinical medicine and the various Medical Services Groups including OB/GYN Associates." *Id.* at ¶ 315. Plaintiff argues that she has alleged "substantial cross-pollination" and communication between Dr. Silverman and the leadership at the Entity Defendants. Dkt. No. 88 at 36.

The Court agrees with Relator that the facts in the amended complaint plausibly allege that University OB/GYN had notice that she was engaging in protected conduct.

Dr. Silverman argues that Relator has failed to establish that he had knowledge of her protected activity. *See* Dkt. No. 86-2 at 23. He argues that "[h]er vague allegation that she reported dangerous, fraudulent patient care, and 'clinical gaps and deficiencies' to Dr. Silverman is not enough." *Id.* (quoting Dkt. No. 74 at ¶ 246).[2] He also contends that he did not have notice because "[c]omplaints about patient care and Medicaid/Medicare billing are not the same and cannot be the basis of a retaliation claim under the FCA." Dkt. No. 86-2 at 24. University OB/GYN's similarly argues that Relator's complaints were "about patient safety and extensive complaints about Dr. Silverman, but only tangentially about billing." Dkt. No. 83-1 at 25. These arguments are unavailing because the complaints about Dr. Silverman were integrally related to the fraudulent billing, as discussed above with respect to the materiality of Relator's claims.

Therefore, Relator has plausibly alleged that Dr. Silverman had notice she was engaging in protected conduct.

### 3. Adverse Action

"To satisfy the third element of a retaliation claim under the FCA, a plaintiff must show that the defendant retaliated against him 'because of the protected conduct.'" *United States v. N.*

---

[2] Dr. Silverman cites to Dkt. No. 74 at ¶¶ 242, 247, but quotes Dkt. No. 74 at ¶ 246.

*Metro. Found. for Healthcare, Inc.*, No. 13-CV-4933, 2019 WL 1597296, *13 (E.D.N.Y. Apr. 14, 2019) (quoting *Dhaliwal v. Salix Pharms., Ltd.*, 752 Fed. Appx. 99 (2d Cir. 2019)).  "Although not squarely addressing the issue, the Second Circuit has implicitly endorsed the application of the *McDonnell Douglas* framework to Section 3730(h) claims."  *Forkell v. Lott Assisted Living Corp.*, No. 10-CV-5765, 2012 WL 1901199, *10 (S.D.N.Y. May 21, 2012) (citing *Liburd v. Bronx Lebanon Hosp. Ctr.*, 372 Fed. Appx. 137, 139 (2d Cir. 2010)).

Relator argues that:

> OB/GYN participated with Dr. Silverman in several acts of overt retaliation including:
>
> 1. The alterations to [Relator's] clinical hours – which correlates directly to compensation;
>
> 2. The removal of [Relator's] Division Director title and the associated reduction in compensation;
>
> 3. The underpayment of [Relator's] compensation;
>
> 4. The cessation of her malpractice coverage; and
>
> 5. Her constructive discharge.

Dkt. No. 88 at 42.  In response to Crouse's argument that she has not alleged adverse actions on its behalf, Relator argues that:

> Crouse participated with Dr. Silverman in several acts of overt retaliation including:
>
> 1. The removal of [Relator's] Division Director title and the associated reduction in compensation;
>
> 2. The admission of patients to [Relator's] care without her approval;
>
> 3. The alterations to [Relator's] clinical hours;
>
> 4. Sham peer reviews;

> 5. Barring [Relator] from the building; and
>
> 6. Restricting [Relator's] access to the EMR which restricted her
> ability to practice and ultimately contributed to her constructive
> discharge.

Dkt. No. 88 at 41.

Defendants each contend that Relator has not established that any of the adverse actions were caused by her engaging in protected activities. *See* Dkt. No. 84-1 at 26-28; Dkt. No. 86-2 at 24; Dkt. No. 83-1 at 27. University OB/GYN argues that Relator alleges retaliatory conduct beginning in December of 2015, but that she did not report fraudulent billing until February 5, 2018, and did not clearly express her concerns of fraudulent billing until 2019. *See* Dkt. No. 83-1 at 27. Dr. Silverman similarly argues that Relator's timeline does not support an inference of causation because it is unclear when in 2015 she alleges that she began making complaints. *See* Dkt. No. 86-2 at 25. Crouse argues that Relator alleges temporary adverse actions, which are insufficient as a basis for a retaliation claim, and that the only adverse action she faced at Crouse was when Dr. Silverman assigned patients to her care without consulting her. Dkt. No. 84-1 at 26-28. Crouse also contends that the time between when Relator alleges she began making complaints to Crouse and when the alleged inverse actions occurred does not support an inference of causality. *See id.* at 29.

Relator points out that the amended complaint alleges that she began reporting issues with "clinical care gaps and deficiencies with her immediate supervisor, Dr. Silverman" in November 2015, Dkt. No. 74 at ¶ 246, and that Dr. Silverman began sending her harassing emails critiquing her work in December 2015. *See id.* at ¶ 332. The short time between Relator's initial reports and Dr. Silverman's reaction supports an inference of causality. *See Rightnour v. Tiffany & Co.*, 354

F. Supp. 3d 511, 527 (S.D.N.Y. 2019) (quoting *Avillan v. Donahoe*, No. 13-CV-509, 2015 WL 728169, *15 (S.D.N.Y. Feb. 19, 2015)) ("[C]ourts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation").

Although Relator has not alleged that there was no other pretext for emails critiquing her work, she has alleged that Dr. Silverman "threatened to reduce [her] compensation" if she did not increase her hours and "refused to permit [her] to attend various standard conferences and professional development events." *Id.* at ¶¶ 338, 342.  The amended complaint alleges that Dr. Silverman engaged in a "campaign of harassment" which, by 2018, had escalated to an extent that it "became impossible for the Upstate Vice President of Research to ignore." *Id.* at ¶ 339.  As evidence of this continued campaign, Relator alleges the Upstate Vice President of Research "sent a letter to Dr. Silverman instructing him to stop attempting to overload Relator's schedule[.]" *Id.* Relator alleges that in response not only did "Dr. Silverman refuse[] to desist" but he also began further increasing Relator's workload by "accepting and admitting patients directly to Relator's care at Crouse Hospital without consulting Relator and without examining or even interacting with the patients." *Id.* at ¶ 340.  The amended complaint therefore sets forth facts tending to show that Dr. Silverman engaged in a campaign of harassment for several years during which he retaliated against Relator for her efforts to raise awareness of his fraudulent billing.  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (holding, in the context of a Title VII claim, that "[t]hough this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship").

Crouse contends that the amended complaint does not allege that it was more than a mere inconvenience to Relator when Dr. Silverman admitted patients to her care at Crouse without consulting her. *See* Dkt. No. 84-1 at 28. However, the amended complaint alleges that this was more than an inconvenience to Relator because it exposed her "to high levels of malpractice risk[.]" Dkt. No. 74 at ¶ 341. Crouse also argues that Relator does not allege that Dr. Silverman was acting in "any capacity on behalf of Crouse" when he allegedly sent Relator "'harassing communications,'" demanded that she "work hours in excess of her clinical commitment," or threatened "to reduce Relator's compensation[.]" Dkt. No. 84-1 at 28. In response, Relator contends that she has alleged that Dr. Silverman engaged in retaliation against Relator in his capacity as "Clinical Department Chair at Crouse" and therefore Crouse is liable. Dkt. No. 88 at 41 (citing Dkt. No. 74 at ¶¶ 28, 343). At this motion to dismiss stage, Relator has adequately alleged sufficient connections between Dr. Silverman and Crouse to plead that Crouse is responsible for Dr. Silverman's retaliatory adverse actions.[3]

University OB/GYN and Dr. Silverman only dispute that they took adverse actions against Relator insofar as she alleges that she was constructively discharged. *See* Dkt. No. 83-1 at 25 (citing Dkt. No. 74 at ¶ 356) (University OB/GYN argues — and Dr. Silverman incorporates that argument, *see* Dkt. No. 86-2 at 25 — that Relator has failed to allege that she was "constructively discharged of her clinical duties on May 31, 2018). University OB/GYN argues that "Relator

---

[3] The Court also notes that the cases Crouse relies on in its motion all address the standard at summary judgment. *See* Dkt. No. 84-1 at 26-28 (quoting *Mirza v. Garnet Health*, No. 20-CV-00556, 2022 WL 826410 (S.D.N.Y. Mar. 17, 2022); *Lucenti v. Potter*, 432 F. Supp. 2d 347 (S.D.N.Y. 2006); *Dhaliwal v. Salix Pharms., Ltd.*, 752 Fed. Appx. 99 (2d Cir. 2019); *Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303 (S.D.N.Y. 2020); *El-Khali v. Usen*, No. 21-1140, 2021 WL 4621828 (6th Cir. Oct. 7, 2021); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 747 (1998)).

fails to allege any specific actions on the part of University OB/GYN which she found so intolerable she felt compelled to resign her clinical duties."  Dkt. No. 83-1 at 26.

Constructive discharge claims require that "the employee to show both (1) that there is evidence of the employer's intent to create an intolerable environment that forces the employee to resign, and (2) that the evidence shows that a reasonable person would have found the work conditions so intolerable that he would have felt compelled to resign." *Makinen v. City of New York*, 722 Fed. Appx. 50, 52 (2d Cir. 2018) (quoting *Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 308 (2d Cir. 2017)).

Relator contends that the amended complaint alleges that Dr. Silverman and University OB/GYN "reduced [her] compensation while increasing her work commitment" and "instituted sham peer review actions against her" such that it was "impossible for her to perform her job." Dkt. No. 88 at 44-45.  Relator alleges that "on May 31, 2018, Relator was constructively discharged from her clinical duties."  Dkt. No. 74 at ¶ 356.  Considering all the alleged adverse actions taken against Relator in light of each other, the amended complaint adequately pleads that Defendants intentionally created an intolerable workplace or that her working conditions were so intolerable that a reasonable person would have felt compelled to resign.  *See Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 90 (2d Cir. 1996) ("Because a reasonable person encounters life's circumstances cumulatively and not individually, . . . [a court should not] treat the various conditions [of a plaintiff's work environment] as separate and distinct rather than additive").

The Court therefore denies Defendants' motions to dismiss Relator's FCA and NYFCA retaliation claims.

**F.    Labor Law Claims**

Section 741 is "intended to protect health care workers who complain about unsafe medical practices." *Mayer v. Neurological Surgery, P.C.*, No. 15-CV-0864, 2016 WL 347329, *3 (E.D.N.Y. Jan. 28, 2016). Section 740 prohibits employers from retaliating against an employee who "discloses or threatens to disclose to a supervisor or public body an activity, policy or practice of the employer that is in violation of a law, rule or regulation which violation threatens the public health or safety." N.Y. Lab. Law § 740(2)(a). Sections 741 and 740 both afford protections only to employees. The NYLL defines an employer as "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service." N.Y. Lab. Law. § 190(3). Section 741 defines an "employee" as "any person who performs health care services for and under the control and direction of any public or private employer which provides health care services for wages or other remuneration." N.Y. Lab. Law § 741.

Courts in the Second Circuit apply the "economic realities" test based on "the circumstances of the whole activity" to determine if a defendant is an employer under NYLL § 740. *McFarlane v. Iron Mountain Inc.*, No. 17CV3311, 2018 WL 3773988, *6 (S.D.N.Y. Aug. 9, 2018) (citing *Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61, 71-72 (2d Cir. 2003)); *see also Senal v. Lynch*, 217 A.D.3d 466, 468 (1st Dep't 2023); *Collison v. WANDRD, LLC*, No. 24-CV-2221, 2024 WL 3106326, *6 (S.D.N.Y. June 20, 2024) (citing *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 422 (S.D.N.Y. 2017)) (holding that the standards for determining whether a defendant is an employer under the NYLL and under the FLSA "are nearly identical" and that courts assess the "economic realities" to determine if a party is an employer). Under the economic realities test,

66

> The Second Circuit has articulated that if a purported employer:
> "(1) had the power to hire and fire the employees, (2) supervised
> and controlled employee work schedules or conditions of
> employment, (3) determined the rate and method of payment, and
> (4) maintained employment records," then such an individual or
> entity may be held liable under the FLSA.

*Perez v. Westchester Foreign Autos, Inc.*, No. 11-CV-6091 ER, 2013 WL 749497, *6 (S.D.N.Y.

Feb. 28, 2013) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)).

Defendants contend that Relator's NYLL claims fail because she has not adequately

alleged that she is an employee within the meaning of the statute.  *See* Dkt. No. 84-1 at 30; Dkt.

No. 83-1 at 28; Dkt. No. 86-2 at 25-29.  Crouse argues that Relator has not alleged that she

received "wages or any other form of remuneration from Crouse."  Dkt. No. 84-1 at 30.

According to the amended complaint, Relator worked at the Regional Perinatal Center, a

program "jointly controlled by Upstate, Crouse, and [University] OB/GYN," Dkt. No. 74 at ¶ 313,

housed at Upstate Hospital.  *Id.* at ¶ 312.  Relator and other doctors were "responsible for seeing

and treating patients at Upstate and Crouse Hospital."  *Id.*  The amended complaint further alleges

that University OB/GYN and Crouse "share grant monies" and that University OB/GYN

"provides obstetric, gynecological, and MFM care at Crouse Hospital and Crouse Hospital pays

OB/GYN Associates for providing these services."  *Id.* at ¶¶ 43, 44.  In addition to the general

allegations of payment between entities, the amended complaint alleges that "Crouse Hospital

also contributes to the salaries of OB/GYN Associates member physicians via contractual

arrangements with OBGYN Associates."  *Id.* at ¶ 317.

Contrary to Relator's contention that these allegations show that "Crouse contributed funds

to her compensation", it does not necessarily follow from the pleadings that Crouse contributes to

all University OB/GYN member physicians' salaries or that Relator was one of the physicians

whose salary Crouse contributed to.  Similarly, the allegations show payments between

University OB/GYN and Crouse, which does not satisfy the burden of alleging that Relator

received "wages or other remuneration" from Crouse.  N.Y. Lab. Law § 741.  The amended

complaint also alleges that "the Crouse Entities controlled [Relator's] privileges to perform

medicine within Crouse Hospital and through its contract(s) with OB/GYN Associates her ability

to recover compensation for those services" Dkt. No. 74 at ¶ 327.  Although, Relator has alleged

that Crouse is her employer under the second economic realities factor, she has not alleged facts

supporting the other three factors.  There are no allegations that Crouse hired Relator or had the

power to terminate her employment, that it determined the rate of her compensation, or that it

maintained employment records on her.[4]  Therefore, considering the totality of circumstances, the

Court finds that Relator has not pleaded that Crouse had enough control over Relator to be her

employer.  *See Geldzahler v. New York Med. Coll.*, 746 F. Supp. 2d 618, 630-31 (S.D.N.Y. 2010)

(finding that a physician who retained privileges to practice at facilities but was not a salaried

employee and only earned income through billing for services on his private cases at the facilities

was not an "employee" under N.Y. Lab. Law §§ 740 and 741).  Relator's allegation that she "is a

health care employee as defined by New York Labor Law § 741" is conclusory and does not

specify which employer Relator was an employee under and therefore does not save her claim.

Dkt. No. 74 at ¶ 460.

Dr. Silverman also argues that he was not Relator's employer within the meaning of the

statute.  *See* Dkt. No. 86-2 at 25-29.  Dr. Silverman maintains that he was "an individual working

---

[4] The amended complaint alleges that "Crouse Entities maintained records related to the clinical care [Relator] performed on their behalf" but clinical care records are not employment records, such as records tracking hours worked, compensation, or tax related employment information which the Court considers relevant for determining an employer relationship.  Dkt. No. 74 at ¶ 326.

at [Relator's] Employer" and did not have control over Relator's employment. *Id.* at 27.  He

further argues that "only OB/GYN Associates as the entity could fire [Relator], and Dr. Silverman

as chair at the time offered input and signed letters.  In no way is that enough to allege he solely

had the power to hire and fire her." *Id.* at 28.  He concedes that "as chair Dr. Silverman set

Relator's work schedule" but argues that the totality of factors weighs against finding that he was

Relator's employer because only University OB/GYN could determine her salary. *Id.* at 29.  In

reply, Dr. Silverman argues that Relator cannot argue that both Entity Defendants and himself had

power to terminate her employment and final say over her compensation.  *See* Dkt. No. 93 at 13.

Although Relator's arguments are somewhat contradictory, Relator is allowed to argue in the

alternative, and it is conceivable that multiple parties could have control over an employee's

employment and compensation.

The amended complaint alleges that "Dr. Silverman had the power to hire and fire

[Relator], he personally signed the offer letter which effectuated the hiring of [Relator] and he

personally supervised her, controlled her titles, working conditions . . . and compensation." Dkt.

No. 74 at ¶ 319.  Although the amended complaint does not allege that Dr. Silverman had total or

exclusive control over her compensation, it does allege enough control to plausibly suggest that

he was her employer.

University OB/GYN argues that it incorporates Crouse's arguments, including the section

addressing whether Crouse is Relator's employer. *See* Dkt. No. 83-1 at 28.  Although Relator

does not refute this argument, the amended complaint alleges that "OB/GYN Associates

maintained employment records for [Relator] and controlled the majority of her compensation."

Dkt. No. 74 at ¶ 323.  Therefore, the amended complaint sufficiently alleges that University

OB/GYN was Relator's employer.

The amended complaint has adequately alleged that both University OB/GYN and Dr. Silverman were Relator's employers and, for the reasons stated above, that they retaliated against her because of her disclosure of their alleged health care fraud. The Court therefore denies University OB/GYN and Dr. Silverman's motions to dismiss the New York Labor Law claims and accepts Crouse's motion to dismiss the New York Labor Law claims.

## G.  Leave to Amend

Relator argues that she should be granted leave to amend the amended complaint should Defendants' motion to dismiss any causes of action be granted. *See* Dkt. No. 88 at 46. Relator does not propose any pleadings or additional factual allegations which would cure her deficient pleadings, but merely relies on the holding of *Foman v. Davis*, 371 U.S. 178, 182 (1962). As *Foman* states, leave to amend should not be denied in the absence of certain circumstances which include "repeated failure to cure deficiencies." *Foman*, 371 U.S. at 182. Crouse opposes Relator's requestion for leave to amend. *See* Dkt. No. 92 at 17.

"A district court has broad discretion in determining whether to grant leave to amend, and we review such determinations for abuse of discretion." *Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000). Leave to amend should be "freely give[n] . . . when justice so requires," FED. R. CIV. P. 15(a)(2), but "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party," *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008); *see, e.g., Armstrong v. McAlpin*, 699 F.2d 79, 93-94 (2d Cir. 1983) (holding that, in dismissing second amended complaint, the court did not abuse its discretion in refusing to allow "a fourth attempt to plead").

Relator filed her initial complaint in 2020, and Defendants moved to dismiss the complaint in July 2023. *See* Dkt. Nos. 1, 58, 59, 60. Relator then moved to amend the complaint, and the Court granted that motion. *See* Dkt. No. 72. Relator filed an amended complaint in December 2023, *see* Dkt. No. 74, and Defendants moved to dismiss the amended complaint with similar arguments to those made in support of their earlier motions to dismiss. *See* Dkt. Nos. 83, 84-1, 86-2. Thus, before filing the amended complaint, Relator was fully aware of the challenges to her pleading; she asked and received an opportunity to file an amended complaint, and her amended complaint failed to cure the deficiencies. In asking for leave to file yet another amended complaint, Relator did not proffer or describe a proposed new pleading to cure the deficiencies. It is unlikely that another opportunity to amend will result in a well-pleaded complaint. Therefore, Relator's request for leave to amend is denied.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** Defendant University OB/GYN's motion to dismiss (Dkt. No. 83) is **GRANTED in part and DENIED in part**;[5] and the Court further

**ORDERS** that Defendant Crouse's motion to dismiss (Dkt. No. 84) is **GRANTED in part and DENIED in part**;[6] and the Court further

**ORDERS** that Defendant Dr. Silverman's motion to dismiss (Dkt. No. 86) is **GRANTED in part and DENIED in part**;[7] and the Court further

---

[5] Relator's Reverse False Claims and Conspiracy claims against University OB/GYN for are dismissed.

[6] Relator's claims against Crouse for Reverse False Claims, Conspiracy, and New York Labor Law violations are dismissed.

[7] Relator's Reverse False Claims and Conspiracy claims against Dr. Silverman are dismissed.

**ORDERS** that Relator's motion to for leave to amend (Dkt. No. 88) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: July 31, 2024
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

72